Tesfaye Aberra **GEBREMICHAEL**, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent.

Nos. 92–1678, 93–1486.

United States Court of Appeals, First Circuit.

Heard Jan. 5, 1993.

Decided Nov. 23, 1993.

---

Eliza C. Klein, Boston, MA, for petitioner.

Donald A. Couvillon, Civ. Div., Office of Immigration Litigation, with whom Frank W. Hunger, Asst. Atty. Gen., Stuart M. Gerson, Asst. Atty. Gen., and Richard M. Evans, Asst. Director, Office of Immigration Litigation, Washington, DC, were on brief, for respondent.

Before TORRUELLA, SELYA and STAHL, Circuit Judges.

STAHL, Circuit Judge.

In these consolidated appeals, petitioner Tesfaye Gebremichael claims that the Board of Immigration Appeals (the Board or BIA) erred in finding him ineligible for asylum, withholding of deportation, and suspension of deportation. *See* 8 U.S.C. §§ 1158(a), 1253(h), and 1254(a) (1988 & Supp. IV 1992). Petitioner's principal argument is that he is eligible for asylum as a result of the detention and torture visited upon him as a means of persecuting his brother. Petitioner also raises the vexing procedural issue of when the Board can take "official notice" of country conditions without giving an alien warning or a predecision opportunity to respond. After a careful review, we hold that petitioner is statutorily eligible for asylum and that he is entitled to a meaningful opportunity to respond to extra-record facts noticed by the Board.

*I.*

*BACKGROUND* [1]

Petitioner is an Ethiopian alien of Amhara descent. He was born in 1960 in Addis

1. Since neither the underlying facts nor petition-  er's credibility are in dispute, we lay out the facts

Ababa, where some family members continue to live. In his early years he lived under the shadow of the repressive Mengistu regime, although he himself never suffered physical harm or a deprivation of liberty until he was older.[2] Petitioner was allowed to finish his education. In 1981, he received an engineering degree from the University of Addis Ababa and was ordered to work at the Ethiopian Construction Authority.

In September 1982, the military authorities arrested petitioner's father and younger brother as they were participating in a Seventh Day Adventist service.[3] It is undisputed that the father and brother were persecuted, although it is unclear whether they suffered religious persecution, political persecution, or both.[4] In any case, petitioner's father was imprisoned for over two years before he was released. Petitioner's brother was also imprisoned but, following his transfer to a hospital in January 1983, he managed to escape to the family home. Petitioner then helped "smuggle" his brother out of the country.[5]

Shortly thereafter petitioner was arrested by the Dergue. Although the authorities did not have—and never obtained—any information linking petitioner to his brother's escape, petitioner was accused of aiding the escape of an enemy of the state. Petitioner was taken to the Central Investigation Center, controlled by the agency responsible for investigating anti-revolutionary activities and opposition to the government. Every day for two weeks Dergue personnel interrogated and tortured petitioner as they tried to force him to reveal his brother's hiding place.[6] Petitioner was then held for an additional three and a half months in a different section of the Center. He was no longer interrogated but was occasionally forced to crawl on sharp stones. In late June 1983, petitioner was released after the Dergue learned that his brother had left the country. Upon release

as described by petitioner's testimony and other information in the record submitted by him.

2. Under the feudal regime of Haile Selassie, petitioner's family was the wealthy owner of several businesses. Shortly after a revolution in 1974, the Dergue, headed by Mengistu Haile Mariam, took power and imposed a Marxist regime. The Dergue carried out a campaign of repression that included the identification of individuals who had been among the wealthy class under the former government, repression of religious and political opposition activity, and extensive surveillance of civilians by local committees. The Dergue confiscated the property of petitioner's family. Petitioner, who was fourteen years old at the time, became active in an opposition organization, although the Dergue was apparently not aware of his political activity, if at all, until after he left the country. In the "Red Terror" of 1976, the Dergue heightened its repressive activity and killed many suspected opponents, frequently targeting families—many of whom were Amhara—who had enjoyed a privileged status under Haile Selassie. Petitioner does not claim that he or his family fell victim to the Red Terror.

3. While the rest of petitioner's immediate family remained members of the Ethiopian Orthodox Church, petitioner's father and younger brother became Seventh Day Adventists just after the revolution.

4. According to petitioner, in an attempt to coerce his father and brother into renouncing their religious beliefs, the Dergue accused them of "using the name of God and the church to propagate false information against the state by working together with foreign Interventionists (i.e., the CIA) who sought to overthrow the government." To the extent that the Dergue imputed pro-Western political beliefs to the father and brother, they may have suffered political persecution.

5. The brother has since been granted political asylum in the United States.

6. Petitioner described his experience as follows:

Each day, I would be taken from my cell to a room where the interrogations took place. There, two men with masks over their heads would beat me on the soles of my feet [and] then they would call in the political cadre, who demanded information about my brother. I always said that I knew nothing about his whereabouts or this escape. The political cadre would then order the other men to inflict various tortures on me before I would be subjected to the next round of questions. Sometimes they would push my head into a tank of filthy water until I nearly lost consciousness. Then they would let me up and I would be questioned again. At other times they would threaten to kill me and then enact a mock execution. In still another method used to make me talk, they would throw me onto the floor of a dark cell and kick me all over my body, including my head and genitals. On other occasions I would just be beaten, and frequently I was made to crawl on my knees over sharp stones for a half hour at a time. In all, the interrogation sessions usually lasted approximately three hours, at the end of which I could be physically thrown or kicked back into my cell.

he was threatened with execution if he were to engage in any political or religious activities disfavored by the government. There is little evidence in the record that petitioner was ever formally charged, prosecuted, or convicted.[7]

Fearing additional mistreatment if the Dergue learned of his role in his brother's escape or his own opposition political activities, petitioner made plans to leave the country. He obtained an illegal passport and, through UNESCO, secured a student visa and scholarship to attend graduate school in Sierra Leone. He left Ethiopia in October 1983.

After completing his studies in June 1985, petitioner still feared persecution should he return to Ethiopia but believed he would not be allowed to remain in Sierra Leone. While it is not clear when petitioner decided to attempt to stay in the United States, he entered this country on June 23, 1985, with a six month visitor's visa.[8] Petitioner applied for asylum on December 12, 1985.

At a deportation hearing later that month, petitioner conceded deportability but moved for three forms of relief from deportation under the Immigration and Nationality Act (INA): political asylum,[9] withholding of deportation[10] and voluntary departure.[11] 8 U.S.C. §§ 1158(a), 1253(h), and 1254(e) (1988 & Supp. IV 1992). The IJ granted petitioner's request for voluntary departure but de-

nied the other two applications. Petitioner then appealed to the Board, which received briefs in November 1989 and heard oral argument in March 1990. The Board did not issue a decision until two years had passed.

In the intervening time, conditions in Ethiopia had changed drastically. Mengistu fled the country in May 1991, the Dergue was quickly dismantled, and a multiparty transitional government was established to organize democratic elections. The transitional government declared that citizens in exile were welcome to return.

In its decision on March 25, 1992, the Board not only reviewed the record *de novo* but also looked beyond the record to take administrative notice of the political changes in Ethiopia as described in a state department report. The Board did not inform petitioner of its intention to notice these facts, nor did it give petitioner an opportunity to respond. Although it extended the time for voluntary departure, the Board affirmed the IJ's finding that petitioner was not eligible for either asylum or withholding of deportation.

The Board found petitioner ineligible for asylum for failure to prove either past persecution or a well-founded fear of future persecution. The Board reasoned that petitioner had not shown that the "reprehensible" detention and torture inflicted on him in 1983 were "to punish him for one of the five

---

7. We note again that the immigration judge did not discredit petitioner's testimony, which was corroborated to an extent by a physical examination of petitioner (which showed permanent scars on his knees) as well as evidence from the State Department and human rights organizations describing the Dergue's typical torture techniques.

8. Petitioner's brother was living in the United States at the time.

9. Under 8 U.S.C. § 1158(a) the Attorney General (whose authority in these matters is delegated to the INS, with review by the Board) has the discretion to grant asylum to an alien who qualifies as a "refugee" within the meaning of 8 U.S.C. § 1101(a)(42)(A) (1988). In relevant part, section 1101(a)(42)(A) defines "refugee" as

any person who is outside any country of such person's nationality ... and who is unable or unwilling to return to, and is unable or unwill-

ing to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

10. 8 U.S.C. § 1253(h)(1) provides that "[t]he Attorney General shall not deport or return any alien ... to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion."

11. 8 U.S.C. § 1254(e)(1) gives the Attorney General discretion to "permit any alien under deportation proceedings ... to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least five years immediately preceding his application for voluntary departure."

grounds specified in the [INA] rather than to compel him to reveal the whereabouts of his missing brother." *In re Gebremichael,* No. A26876916, slip op. at 3 (BIA Mar. 25, 1992) (*Gebremichael I* ). The Board also found that petitioner had not demonstrated a well-founded fear of future persecution on any basis. Additionally, the Board noted that the political changes in Ethiopia undercut petitioner's claims that he might be persecuted if he were repatriated. Finally, the Board rejected the request for withholding of deportation, which requires an even greater showing of the likelihood of future persecution.

██ Petitioner then filed with the Board a motion to reconsider its denial of asylum and withholding of deportation as well as to reopen to allow him to apply for suspension of deportation.[12] Concurrently, petitioner sought review in this court.[13]

In support of his motion to reconsider, petitioner offered an array of new evidence to bolster his proof of a well-founded fear of future persecution. Relying on affidavits

and background material, petitioner claimed that persecution was once again part of the currency of political conflict in Ethiopia. There was evidence that the multiparty coalition that ousted Mengistu had fractured and that the government was dominated by Marxist members of the Tigray ethnic group who were increasingly intolerant of political and ethnic differences. There was also evidence that, should he return to Ethiopia, petitioner could face persecution based on his Amhara ethnicity,[14] his family's privileged social status before the 1974 revolution, and his expatriate political activity in opposition to the new government.

As part of his motion for rehearing, petitioner also moved to reopen so that he could apply for suspension of deportation on the ground that repatriation would constitute "extreme hardship" to him. While petitioner did not claim that he would be unable to make a living in Ethiopia, he argued that his departure would rupture important family ties,[15] deprive him of "the only safe home

12. Pursuant to 8 U.S.C. § 1254(a) (1988 & Supp. IV 1992):

the Attorney General may, in his discretion, suspend deportation [of an alien who] has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [the suspension application,] and proves that during all of such period he was and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in extreme hardship to the alien.

Under 8 C.F.R. § 3.2 (1993), the Board "may on its own motion reopen or reconsider any case in which it has rendered a decision." The regulation provides, however, that "[m]otions to reopen in deportation proceedings shall not be granted unless it appears to the Board that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing." *Id.*

13. The Board's first decision was a "final order[ ] of deportation" that can be appealed to this court pursuant to 8 U.S.C. § 1105a (1988 & Supp. IV 1992). While a petitioner must "exhaust[ ] the administrative remedies available to him as of right under the immigration laws and regulations," 8 U.S.C. § 1105a(c), a petitioner need not move for rehearing by the Board in order to fulfill the exhaustion requirement. *Rhoa–Zamora v. INS,* 971 F.2d 26, 31 (7th Cir.1992), *cert. denied* —— U.S. ——, 113 S.Ct. 2331, 124 L.Ed.2d 243 (1993). *But see Dokic v. INS,* 899

F.2d 530, 532 (6th Cir.1990). We have not yet decided, as have some circuits, whether the *filing* of a motion to reopen deprives us of jurisdiction we would otherwise have. *See White v. INS,* 6 F.3d 1312, 1317 (8th Cir.1993) (holding that pendency of motion to reopen or reconsider an order of deportation does not render the order nonfinal for jurisdictional purposes); *Rhoa–Zamora,* 971 F.2d at 32–33 (same); *Alleyne v. INS,* 879 F.2d 1177, 1181 (3d Cir.1989) (same). *But see Fleary v. INS,* 950 F.2d 711, 713 (11th Cir. 1992) (filing of motion to reopen render's BIA decision nonfinal and non-appealable); *Jian Gang Chu v. INS,* 875 F.2d 777, 780–81 (9th Cir.1989) (same). In this case, we opted for a prudent alternative: staying our decision until the Board resolved petitioner's motions and consolidating the initial appeal with an appeal from a denial of the motion for rehearing.

14. We note in passing that one federal court recently found that "the Amharan people are now the subject of persecution by the Tigrean government that is in power in Addis Ababa," and that an Ethiopian alien of Amhara descent had raised a "well-founded fear of persecution." *United States v. Dagnachew,* 808 F.Supp. 1517, 1522 (D.Colo.1992).

15. Five of petitioner's siblings are currently in the United States: Solomon was admitted in 1984 as a refugee; Getachew was admitted as a refugee in 1991 (after Mengistu's fall); Tiruwork is a permanent resident; and Genet and Yosef

[he] has known since he was fourteen years old," and aggravate his depression and anxiety, perhaps to the point of suicide.

Reaching the merits of petitioner's claims, the Board stated that "none of the evidence presented by this respondent in any way changes our view of the respondent's asylum application." *In re Gebremichael*, No. A26876916, slip op. at 3 (BIA Apr. 20, 1993) (*Gebremichael II*). Once again, without warning and without providing a predecision opportunity to respond, the Board took administrative notice of another state department report which suggested that there had been no widespread acts of persecution of minorities, including the Amharas. The Board then reaffirmed its finding that petitioner was ineligible for asylum or withholding of deportation.

Finally, the Board found that petitioner failed to present *prima facie* evidence of "extreme hardship" sufficient to qualify him for suspension of deportation.[16] To support its finding, the Board noted that petitioner (1) did not appear to be the primary financial support of any family member; (2) is a highly educated young man who could probably obtain employment anywhere he went; (3) has sizable bank assets which he could use to reestablish himself in Ethiopia; (4) did not present entirely credible evidence of the psychological consequences of repatriation; and (5) did not substantiate his claim that he would be targeted by the present government in Ethiopia.

are students in the United States. Getachew and Yosef live with petitioner, although there is no evidence that they are currently dependent on him. While petitioner's mother is also a permanent resident, she has since returned to Addis Ababa to be with petitioner's father and sister Tigist. One brother has already filed a visa petition to allow the father to come to the United States.

16. The INS did not dispute petitioner's allegations that, during the course of nearly eight years of immigration proceedings, petitioner has been physically present in the United States and has been a person of good moral character. Petitioner has never been arrested in the United States and his imprisonment and torture at the hands of the Dergue was his only brush with the law in Ethiopia. Petitioner has been employed since September 1985.

Petitioner appealed the denial of the motion to reopen and reconsider and we consolidated the two appeals.

## II.

### STANDARD OF REVIEW

The Board's determination of statutory eligibility for relief from deportation—a mixed question of law and fact—is conclusive if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4) (1988); *INS v. Elias–Zacarias*, — U.S. —, —, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992).[17] Thus, to obtain reversal of the Board's determination of ineligibility, petitioner "must show that the evidence he presented was so compelling that no reasonable factfinder could fail to find [the elements of statutory eligibility]." *Elias–Zacarias*, — U.S. at —, 112 S.Ct. at 817.

## III.

### DISCUSSION

Of the multitude of issues petitioner raises, two arguments require serious consideration: (1) the Board erred in failing to find petitioner eligible for asylum based on his detention and torture at the hands of the former Ethiopian government; and (2) the Board unfairly surprised petitioner by taking administrative notice of conditions in his country of origin. We address each in turn.[18]

17. We agree with respondent that we normally review a denial of a motion to reopen or reconsider for abuse of discretion. *See INS v. Doherty*, — U.S. —, — – —, 112 S.Ct. 719, 724–25, 116 L.Ed.2d 823 (1992); *Leblanc v. INS*, 715 F.2d 685, 692–93 (1st Cir.1983). We do not agree, however, that the abuse of discretion standard governs the assignment of error at issue in this case. Where the agency denies a motion to reopen or reconsider by making a determination of statutory eligibility, that determination must be supported by substantial evidence. *See Elias–Zacarias*, — U.S. at —, 112 S.Ct. at 815 (reviewing asylum eligibility determination for substantial evidence even after Board's discretionary denial of motion to reopen).

18. We do not address in any detail petitioner's meritless argument that the Board erred in finding him ineligible for withholding of deportation

## A. Asylum

Asylum involves a two-step process: (1) a finding of statutory eligibility; and (2) a discretionary decision whether to grant asylum. *Alvarez–Flores*, 909 F.2d at 3. An alien is eligible for asylum if he can show that, on account of one of the five grounds enumerated in the INA, *supra* note 9, he has suffered past persecution *or* has a well-founded fear of future persecution. *See Ravindran v. INS*, 976 F.2d 754, 758 (1st Cir. 1992) (citing *Desir v. Ilchert*, 840 F.2d 723, 729 (9th Cir.1988) ("[P]ast persecution, without more, satisfies the [definition of refugee] even independent of establishing a well-founded fear of future persecution.")); *see also Skalak v. INS*, 944 F.2d 364, 365 (7th Cir.1991); *In re H–M*, Int.Dec. 3204, 1993 WL 315990, at \*4 (BIA Aug. 11, 1993); *In re T–*, Int.Dec. 3187, slip op. at 9 (BIA Oct. 13, 1992); *In re Chen*, Int.Dec. 3104, slip op. at 3–4 (BIA Apr. 25, 1989); 8 C.F.R. § 208.-13(b) (1993) ("The applicant may qualify as a refugee *either* because he has suffered actual past persecution *or* because he has a well-founded fear of future persecution.") (emphasis supplied).

Petitioner claims that the Board erred in finding him ineligible for asylum despite the torture and lengthy detention he suffered under Ethiopia's former regime. The Board did not find that the harm inflicted upon petitioner was too mild to constitute persecution. Instead, the Board essentially held that petitioner was merely a vehicle for the persecution of his brother and not the victim of "persecution" within the meaning of the INA. The Board reasonably found that the Dergue did not detain and torture petitioner because of his own actual or imputed political or religious beliefs. Nonetheless, however reasonable this finding, it does not dispose of petitioner's asylum claim. Petitioner argues—and we agree—that he was persecuted for *other* reasons equally cognizable under the INA.

Petitioner's strongest argument is that he is a refugee because he was mistreated on account of his relationship to his brother.[19] While most asylum claims involve other types of persecution, the INA also offers refugee status to victims of "persecution on account of ... membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A).[20] An applicant qualifies as a "refugee" under the INA if membership in a social group is "at the root of persecution," such that membership itself generates a "specific threat to the [applicant]." *Ananeh–Firempong*, 766 F.2d at 626–27 (citation and quotation omitted). Accordingly, we must determine

under 8 U.S.C. § 1253(h). Even without recourse to extra-record evidence of country conditions, the Board reasonably found that petitioner had not demonstrated a "clear probability" of future persecution should he return to Ethiopia. *See Alvarez–Flores v. INS*, 909 F.2d 1, 3 (1st Cir.1990) (citing *INS v. Stevic*, 467 U.S. 407, 429–30, 104 S.Ct. 2489, 2501, 81 L.Ed.2d 321 (1984)). For the reasons stated *infra* note 19, we express no opinion on whether the Board erred in finding that petitioner failed to make the lesser showing of a "well-founded" fear of future persecution with respect to the asylum claim. *Cf. Alvarez–Flores*, 909 F.2d at 4 (discussing difference between standards for asylum and withholding of deportation); *Blanco–Comarribas v. INS*, 830 F.2d 1039, 1042 (9th Cir.1987) (holding that fear is "well-founded" if there is "[e]ven a ten percent chance that the occurrence will take place") (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 431, 107 S.Ct. 1207, 1213, 94 L.Ed.2d 434 (1987)).

19. Petitioner also advances two other theories to support his claim of past persecution: (1) he is a political or religious refugee because he was an intended conduit for the political or religious persecution of another; and (2) he is a political refugee because he suffered excessive punishment under suspicious circumstances. In addition, petitioner claims that he is eligible for asylum based on a well-founded fear that he will face future persecution in Ethiopia on account of his ethnicity, social status and political views. In light of our holding below that petitioner is a social refugee based on past persecution, we do not address these other theories.

20. This ground of persecution is not frequently used or interpreted, probably because most asylum claims involve other types of persecution as well. *See* United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status* ¶ 77, at 19 (1979) (U.N.Handbook) ("A claim to fear of persecution [based on membership in a particular social group] may frequently overlap with a claim to fear of persecution on other grounds, i.e. race, religion or nationality."); *cf. Ananeh–Firempong v. INS*, 766 F.2d 621, 626 (1st Cir. 1985) (referring to U.N. Handbook as a "useful tool" for interpreting the phrase "social group") (citation omitted). At the same time, we have followed the language of the statute in recognizing that social group persecution can be an independent basis of refugee status. *See Ananeh–Firempong*, 766 F.2d at 626–627.

whether a family is a cognizable "social group" within the meaning of the INA and, if so, whether petitioner's torture and detention by the authorities can be traced to his family membership.

In laying out general principles governing this type of persecution, the Board has stated that

> "persecution on account of membership in a particular social group" encompasses persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or *kinship ties*, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.

*In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985) (emphasis supplied), *overruled on other grounds by In re Mogharrabi*, 19 I. & N. Dec. 439 (BIA 1987). *See also Gomez v. INS*, 947 F.2d 660, 664 (2d Cir.1991) (explaining that a social group must be "recognizable and discrete" such that the "would-be persecutors could identify them as members of the purported group").

There can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family. Indeed, quoting the Ninth Circuit, we recently stated that " 'a prototypical example of a "particular social group" would consist of the immediate members of a certain family, the family being a

focus of fundamental affiliational concerns and common interests for most people.' " *Ravindran*, 976 F.2d at 761 n. 5 (1st Cir. 1992) (quoting *Sanchez–Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir.1986)).[21]

■ We now turn to the question of causation. In the case on appeal, the link between family membership and persecution is manifest: as the record makes clear and the INS itself concedes, the Ethiopian security forces applied to petitioner the "time-honored theory of *cherchez la famille* ('look for the family')," the terrorization of one family member to extract information about the location of another family member or to force the missing family member to come forward. As a result, we are compelled to conclude that no reasonable factfinder could fail to find that petitioner was singled out for mistreatment because of his relationship to his brother. Thus, this is a clear case of "[past] persecution on account of ... membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). Accordingly, we must determine what relief, if any, is necessary.

■ Remand will not always be appropriate when the Board has erred in determining eligibility for discretionary relief from deportation. If the Board has already properly exercised its discretion to deny relief, remand would be a futile gesture. *See Leblanc*, 715 F.2d at 691 (finding no need to remand where Board "clearly made a discretionary decision"); *see also Dhine v. Slattery*, 3 F.3d 613, 619 (2d Cir.1993) (declining to remand to IJ on issue of relief from deportation where BIA had "plainly stated" that it would not grant relief in the exercise of discretion even if applicant were eligible). In this case, however, the Board has not clearly stated that it would deny asylum if petitioner were eligible. Quite the contrary, the Board has asserted that "[b]ecause we have found that the respondent failed to establish his statutory eligibility for asylum, we need not address whether he merits that form of relief in the exercise of discretion." *Gebremichael I*, slip op. at 3.[22] Accordingly, we vacate the Board's conclusion that petitioner is ineligible for asylum and remand for a decision wheth-

---

**21.** The exact state of the law in the Ninth Circuit is not entirely clear. Without mentioning *Sanchez–Trujillo* or analyzing the question in depth, a panel in *Estrada–Posadas v. INS*, 924 F.2d 916, 919 (9th Cir.1991), held that the concept of per-

secution of a social group does not extend to the persecution of a family.

**22.** Even absent an obvious exercise of discretion, we might decline to remand if reconsideration by

er the Board, in its discretion, will grant asylum in this case.[23]

## B. Official Notice

Petitioner's second major argument is that the Board's taking of official notice of extra-record material fell short of fundamental standards of procedural fairness. Since the noticed material is likely to play an important role on remand,[24] we address this issue as well. We first discuss when and how the Board may take official notice of extra-record facts. We then determine whether it was proper for the Board to take notice of both indisputable and disputable facts concerning Ethiopia without giving petitioner any warning or a predecision opportunity to respond.

### 1. The Legal Framework

In keeping with standard principles of administrative procedure and in the absence of any prohibition in the INA itself, the Board has the discretion to take "official" or "administrative" notice of extra-record legislative facts. *See, e.g., Kaczmarczyk v. INS,* 933 F.2d 588, 593 (7th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 583, 116 L.Ed.2d 608 (1991); *see generally* 3 Kenneth C. Davis & John P. Wilson, *Administrative Law Treatise* § 15, at 132–217 (2d ed. 1980).[25] Thus, the Board is free to take official notice of facts such as a change in government in an applicant's home country. *See Acewicz v. INS,* 984 F.2d 1056, 1060 (9th Cir.1993) (reviewing cases); *Gutierrez–Rogue v. INS,* 954 F.2d 769, 773 (D.C.Cir. 1992); *Rivera–Cruz v. INS,* 948 F.2d 962, 966–67 (5th Cir.1991); *Kapcia v. INS,* 944 F.2d 702, 705 (10th Cir.1991); *Kaczmarczyk,* 933 F.2d at 593–94; *McLeod v. INS,* 802 F.2d 89, 93 n. 4 (3d Cir.1986); *Zamora v. INS,* 534 F.2d 1055, 1062 (2d Cir.1976) (Friendly, J.).[26]

> Even if one were to assume, however, that [petitioner's] previous experiences in Ethiopia did amount to past persecution, or that at the time he left and for some time thereafter he had a well-founded fear of persecution should he return, it has not been established that he presently merits a grant of asylum.

*Gebremichael I,* slip op. at 3. The proper rule is that once an applicant has shown past persecution, the burden shifts to the government to show that the applicant lacks a well-founded fear of future persecution. *See In re Chen,* Int.Dec. 3104, slip op. at 4; 8 C.F.R. § 208.13(b).

the agency would clearly be an empty exercise. *See Hibbert v. INS,* 554 F.2d 17, 21 (2d Cir.1977) (holding that, since relief obviously would be denied as a matter of discretion, "there is no reason to remand the case to the Board for a pointless determination" of statutory eligibility); *see also In re San Juan Dupont Plaza Hotel Fire Litigation,* 994 F.2d 956, 968–69 (1st Cir.1993) (noting that appellate court may forego remand where remanding would be an empty exercise). Here, the Board did state that there were no "humanitarian or compelling bases warranting a grant of asylum," *Gebremichael I,* slip op. at 3. Nonetheless, compelling circumstances appears to be an alternative basis for *granting* asylum, not an independently sufficient ground for *denying* asylum. *See In re Chen,* Int.Dec. 3104, slip op. at 5; 8 C.F.R. § 208.13(b)(1) (1993). Moreover, Board precedent and agency regulations indicate that the Board will choose to deny asylum if it finds that the agency has proven that it is more likely than not that petitioner lacks a well-founded fear of persecution. *See In re Chen,* slip op. at 4; 8 C.F.R. § 208.13(b)(1). In this case, a careful reading of the record suggests that there is conflicting evidence about the likelihood of future persecution. As will be discussed below, our crystal ball may also be clouded by procedural error. Petitioner was not afforded an opportunity to respond to the noticed fact that Amharas have not suffered persecution under the new regime, a fact which has clearly played an important role in the case. As a result, we cannot conclude that remand would be a futile gesture.

23. We note that the Board appears to have misstated the agency's own guidelines for exercising discretion in an asylum case. The Board stated:

24. Board precedent and agency regulations indicate that the exercise of discretion on remand will depend heavily on extra-record evidence of country conditions. *See In re Chen,* Int.Dec. 3104, slip op. at 4 (Board may take administrative notice of changed circumstances in determining whether to grant asylum); 8 C.F.R. § 208.13(b)(1) (victim of past persecution shall be denied asylum if it is more likely than not that, due to current country conditions, applicant lacks well-founded fear of future persecution).

25. Legislative facts are those which "do not usually concern the immediate parties but are the general facts which help the tribunal decide questions of law and policy and discretion." 2 *Administrative Law Treatise, supra,* § 12:3, at 413. In contrast, "adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent." *Id.*

26. Some courts have suggested that the propriety of official notice turns on whether the extra-record fact is beyond reasonable dispute. *See Kapcia,* 944 F.2d at 705 ("commonly acknowl-

■ In contrast to the opaque question of the proper *subject* of official notice, the more important question concerns the proper *procedure* for reliance on extra-record facts when an alien's freedom to stay in this country hangs in the balance. Since the exclusive administrative procedures of the INA do not include rules governing official notice, petitioner's procedural claim must rest on the Due Process Clause of the Fifth Amendment.[27] *See Kaczmarczyk*, 933 F.2d at 595. It is well settled that an alien in a deportation proceeding is entitled to procedural due process. *Id.* at 595–60 (collecting cases). The issue is what process is due when the Board chooses to take official notice of conditions in the applicant's home country.

We agree with the majority of those circuits which have addressed the question that the motion to reopen process can ordinarily satisfy the demands of due process.[28] *See Gutierrez–Rogue*, 954 F.2d at 773 (motion to reopen procedure provides adequate opportunity to challenge officially noticed fact); *Rivera–Cruz*, 948 F.2d at 968 (same); *Kaczmarczyk*, 933 F.2d at 595–97 (presuming that good faith administration of motion to reopen process is sufficient to satisfy that right). *But see Castillo–Villagra*, 972 F.2d at 1029 (holding that motion to reopen process is not adequate to satisfy due process); *Administrative Law Treatise, supra*, § 12:4, at 320 (Supp.1989) ("The sound practice for both courts and agencies would be one of full liberality in allowing the free use of legislative facts ... along with strictness in requiring that parties be given a *predecision*

---

edged facts" subject to official notice); *Kaczmarczyk*, 933 F.2d at 593–94 (same); *McLeod v. INS*, 802 F.2d at 93 n. 4 (same); *Dhine v. District Director*, 818 F.Supp. 671, 677 (S.D.N.Y.) (BIA erred in taking administrative notice of reasonably disputable fact that there had been no persecution of Jews in Ethiopia after fall of Mengistu regime), *rev'd in part on other grounds*, 3 F.3d 613 (2d Cir.1993).

If there is a rule against notice of disputable facts, however, it is not applied strictly. Courts have held that the Board may draw reasonable inferences from indisputable facts, even though the inferences bear a striking resemblance to disputable facts. *See Kapcia*, 944 F.2d at 705 (after taking administrative notice of Solidarity's commonly acknowledged position in Poland's new coalition government, BIA reasonably inferred that Solidarity members will not be persecuted); *Kaczmarczyk*, 933 F.2d at 594 (same). Courts have also treated as indisputable certain facts that arguably are not. *Compare Gutierrez–Rogue v. INS*, 954 F.2d at 773 (holding that Board could take official notice of fact that Sandinista party no longer governs Nicaragua) *with Castillo–Villagra v. INS*, 972 F.2d 1017, 1027 (9th Cir.1992) (holding that fact that Sandinistas were ousted from power in Nicaragua was debatable because Sandinistas retained power over police and military).

We find the distinction between disputable and indisputable legislative facts to be an unnecessary distraction from the procedural rights at issue. Professor Davis suggests—and we agree—that any useful legislative fact is properly subject to official notice whether that fact is disputable or not. 3 *Administrative Law Treatise, supra*, § 15.11, at 185–87.

**27.** Agency regulations promulgated in 1990 already provide procedural protection governing the taking of official notice by asylum officers. *See* 55 Fed.Reg. 30,674 (1990) (now codified at 8 C.F.R. § 208.12(a) (1993)) ("Prior to the issuance of an adverse decision made in reliance upon [state department materials], that material must be identified and the applicant must be provided with an opportunity to inspect, explain, and rebut the material....") On its face, however, the regulation applies to asylum officers, not immigration judges or the Board of Immigration Appeals. In its 1992 decision on the merits, the Board took official notice of conditions in Ethiopia without referring to section 208.12(a). *Gebremichael I*, slip op. at 2. Similarly, in its decision on the motion to reconsider, the Board claimed that its notice-taking authority derived from its "discretionary powers of review" under 8 C.F.R. § 3.1(d)(1) (1993), which sets forth the general powers of the Board. *Gebremichael II*, slip op. at 3.

**28.** The distinction between disputable and undisputable facts has also unnecessarily confused the question of what procedure should govern official notice in immigration proceedings. For example, the Seventh Circuit has suggested that only "uncontroverted facts" are noticeable and then only when the applicant has an adequate opportunity to respond. *Kaczmarczyk*, 933 F.2d at 594–96. In contrast, the Ninth Circuit has suggested that the Board may take notice of both indisputable and disputable facts, *see Castillo–Villagra*, 972 F.2d at 1028, but that the Board need not provide any opportunity to rebut indisputable facts, *see Acewicz*, 984 F.2d at 1060. The distinction should not be dispositive because an applicant is ordinarily entitled "not only to refute but, what in this situation is usually more important, to supplement, explain, and give different perspective to the facts upon which the agency relies." *Kaczmarczyk*, 933 F.2d at 596 n. 7 (quoting 4 Jacob A. Stein *et al., Administrative Law*, § 25.01 n. 7 (1986)) (internal citation omitted).

chance to respond to whatever extra-record facts are relied upon.") (emphasis supplied).[29]

When, however, the Board intends to take official notice *in deciding a motion to reopen or reconsider* it would be absurd to force an applicant to file a second motion to respond to the newly noticed facts. A multiplicity of motions for rehearing in this context would have two undesirable effects: dilution of the applicant's procedural rights and concentration of the incentive to prolong litigation. *Cf. INS v. Rios–Pineda*, 471 U.S. 444, 450, 105 S.Ct. 2098, 2102, 85 L.Ed.2d 452 (1985) (discussing alien's incentive to delay deportation through meritless appeals). Thus, even if the availability of a motion to reopen or reconsider will ordinarily suffice, the demands of due process will, as always, ultimately depend on the circumstances. *See Mathews v. Eldridge*, 424 U.S. 319, 324, 96 S.Ct. 893, 897, 47 L.Ed.2d 18 (1976). We therefore turn to an analysis of the particular circumstances animating petitioner's case.

*2. Petitioner's Opportunity to Respond*

■ As it was free to do, the Board took administrative notice of legislative facts contained in two state department reports as evidence that petitioner lacks a well-founded fear of persecution. *See Country Reports on Human Rights Practices for 1992* (February 1993); *Country Reports on Human Rights Practices for 1991* (February 1992). The Board cited the reports for the following propositions: (1) in late May 1991, President Mengistu Haile–Mariam fled into exile; (2) in July 1991, a broad-based national conference adopted a charter establishing a multiparty transitional government to organize elections before 1994; (3) the transitional government declared that all citizens in exile were welcome to return; (4) the change of government brought significant improvement in human rights, particularly with respect to free-

dom of speech, assembly, association, religion, and travel; and (5) after the 1991 change of government, there were no widespread acts of persecution of minorities, including the Amharas. *Gebremichael I*, slip op. at 2; *Gebremichael II*, slip op. at 4.

Based on the principles outlined above, all of the extra-record facts considered by the Board were the proper subject of official notice. This is true for the first three "commonly acknowledged facts" concerning the change of government and statements in public documents. It is equally true for the last two propositions, even though they are reasonably disputable generalizations about actual conditions in Ethiopia.

■ The more important question is whether petitioner was afforded an adequate opportunity to respond to the noticed facts. The Board did not warn petitioner of its intention to use extra-record materials; in neither instance did petitioner have a predecision opportunity to respond. *Cf. Acewicz*, 984 F.2d at 1061 (finding no procedural error where applicants did in fact offer evidence before IJ and BIA in response to noticed change of government). Arguably, the motion to reopen process allowed the Board to cure the first procedural irregularity because petitioner had ample opportunity to respond to the material originally noticed. However, petitioner never had an opportunity to respond to the material noticed in the Board's decision on the motion to reopen and reconsider—the (disputable) fact that there had been no widespread persecution of Amharas after the 1991 change of government. In depriving petitioner of an opportunity to respond to this newly noticed fact prior to its adverse decision on the motion to reopen and reconsider, the Board abused our presumption of good faith and ran afoul of petitioner's procedural rights.[30]

---

**29.** The motion to reopen process was clearly not designed as an opportunity to respond to officially noticed facts. *See generally Gomez–Vigil v. INS*, 990 F.2d 1111, 1125 (9th Cir.1993) (per curiam) (Fletcher, J., concurring) ("Section 3.2 proceedings do not suffice because they serve a different purpose and are intended to provide relief for a different problem.") An applicant may be constitutionally entitled to marshall old facts in new ways, although a motion to reopen cannot be granted unless the evidence offered

was previously unavailable. *See* 8 C.F.R. § 3.2. Further, the filing of a motion to reopen does not automatically stay deportation. *See Castillo–Villagra*, 972 F.2d at 1029; *Kaczmarczyk*, 933 F.2d at 597 n. 9. Vindication of an applicant's procedural rights thus depends on the good faith of the Board in handling the motion to reopen. *Accord Kaczmarczyk*, 933 F.2d at 597 n. 9.

**30.** We take no position on the exact nature of the process that was due, such as whether petitioner

## C. Suspension of Deportation

In addition to requesting a rehearing on his asylum request, petitioner also moved to reopen his deportation proceedings in order to apply for suspension of deportation under 8 U.S.C. § 1254(a)(1). Since the Board has already denied the motion to reopen on the merits and since suspension will be petitioner's only remaining remedy if the Board exercises its discretion to deny asylum, we briefly address this issue as well.

■ Like an asylum application, suspension involves a two-step process: (1) a finding of statutory eligibility; and (2) an exercise of agency discretion. *See Vasquez v. INS*, 767 F.2d 598, 601 (9th Cir.1985). An alien is eligible for suspension of deportation if he

> has been physically present in the United States for a continuous period of not less than seven years immediately preceding the date of [the suspension application;] is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in *extreme hardship* to the alien or to his spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence.

8 U.S.C. § 1254(a)(1) (emphasis supplied).

■ As with the asylum claim, the Board determined that petitioner failed to establish statutory eligibility, in this instance by failing to make out a *prima facie* case of "extreme hardship." [31] *Gebremichael II*, slip op. at 4–6. The INS has considerable discretion to define "extreme hardship," *INS v. Jong Ha Wang*, 450 U.S. 139, 144–45, 101 S.Ct. 1027, 1031–32, 67 L.Ed.2d 123 (1981) (per curiam); *Luna v. INS*, 709 F.2d 126, 127 (1st Cir. 1983), and to decide whether or not to re-

open, *Jong Ha Wang*, 450 U.S. at 143 n. 5, 101 S.Ct. at 1030 n. 5; *Luna*, 709 F.2d at 127. Accordingly, we review for abuse of discretion. *Williams v. INS*, 773 F.2d 8, 9 (1st Cir.1985); *Luna*, 709 F.2d at 127; *Antoine-Dorcelli v. INS*, 703 F.2d 19, 21 (1st Cir. 1983). In addition, as with any motion to reopen, we must determine whether petitioner has had a "fair opportunity to develop his side of the story." *Luna*, 709 F.2d at 128. In making such a determination without the benefit of facts developed at a hearing, "common notions of fair play and substantial justice generally require that the Board [and, thus, the reviewing court] accept as true the facts stated in an alien's affidavits." *See id.* (quoting *Reyes v. INS*, 673 F.2d 1087, 1090 (9th Cir.1982)).

■ Even assuming the truth of petitioner's allegations, we find no error in the Board's determination. The Board considered petitioner's allegations that he would suffer hardship if separated from his family members living in this country. Petitioner did not make any substantial allegations about possible economic hardship save his concern about abandoning a career in the United States. The Board also considered the effect of past persecution and the possibility of future persecution but, in line with its own precedent, refused to attach great weight to such evidence in deciding an application for suspension of deportation, which is an alternative form of relief to asylum and withholding of deportation.[32] *See Gebremichael II*, slip op. at 5 (citing *In re Kojoory*, 12 I. & N. Dec. 215 (BIA 1967)). In choosing to discount evidence of persecution when calculating "extreme hardship," the Board was within the limits of its discretion. *Accord Kashefi–Zihagh v. INS*, 791 F.2d 708, 710 (9th Cir.1986). Finally, any procedural error

---

was entitled to an evidentiary hearing or merely an opportunity to respond to the noticed facts with an additional brief supplemented by affidavits or other documentary evidence. Nor do we decide in this case whether an applicant is always entitled to respond when the Board takes notice of *indisputable* extra-record facts.

**31.** Respondent concedes that petitioner has accrued seven continuous years in the United

States from his entry in 1985. Respondent's Brief in No. 93–1486, at 8. Petitioner presented evidence of his good moral character which was neither challenged by the INS nor rejected by the Board. Indeed, the INS granted petitioner's application for voluntary departure, which requires proof of "good moral character." 8 U.S.C. § 1254(e)(1).

**32.** Petitioner claims that since his detention in 1983, he has suffered a range of psychological

in the Board's taking of administrative notice was harmless with respect to the suspension application because the noticed facts were of marginal relevance to the issue of "extreme hardship." As the Board considered the relevant facts and factors, we do not perceive an "unreasoned or arbitrary exercise of discretion." *Williams*, 773 F.2d at 10 (quoting *Rios–Pineda*, 471 U.S. at 451, 105 S.Ct. at 2103).

## IV.

## CONCLUSION

For the foregoing reasons, the Board's initial order as well as its subsequent order denying the motion to reopen and reconsider are affirmed in part and vacated to the extent that the Board failed to recognize petitioner's eligibility for asylum as a social refugee. The matter is remanded to the Board for a discretionary determination whether petitioner, as a social refugee, is entitled to asylum.

*It is so ordered.*

consequences: nightmares; anxiety; depression; inability to trust others; and periodic inability to concentrate. An affidavit from a therapeutic social worker who met with petitioner several times in June 1992, offers similar information. In addition, the social worker opined that deporting petitioner "could cause him permanent emotional scarring, whose potential implications include suicide, harm to himself, and inability to function."