[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-16249

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOV 8, 2006
THOMAS K. KAHN
CLERK

Agency No. A96-287-160

DIANA MARIA TENORIO LONDONO,
ANDRES GOMEZ TENORIO,
SANTIAGO GOMEZ TENORIO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(November 8, 2006)**

Before CARNES, MARCUS and KRAVITCH, Circuit Judges.

PER CURIAM:

Diana Maria Tenorio Londono and her two children, all Colombian citizens,

petition for review of the Board of Immigration Appeals' decision, adopting the opinion of the immigration judge, to deny their claims for asylum and withholding of removal. We affirm.

## I.

Londono, her father Diego, and her brother Fernando, all worked for the Colombian Association of Citizen Radio Band (ACBC)—Diego as president, Fernando as operations and equipment director, and Londono as an occasional marketer. ACBC was a non-profit organization that promoted the use of radio-telephones in rural areas of Colombia to encourage communications between citizens and local government entities, including the police.

In September 2001, Fernando discovered that the Revolutionary Armed Forces of Colombia (FARC) was pirating one of ACBC's antennas to transmit communications between guerilla fighters in the jungles of Colombia. Fernando, after confirming with government officials that it was in fact FARC who was pirating the antennas, cut off FARC's access.

Soon after, members of FARC called Fernando and insisted that he unblock the antenna. FARC also demanded, threatening death if he did not comply, that Diego tell them the names of all of ACBC's subscribes and the codes and serial numbers of the short-wave radios they use. FARC wanted this information so it could track down those who had informed the police of its guerilla activities and so

it could use the frequencies to continue pirating ACBC's communications system.

Diego refused, and as a result, he and Fernando continued to receive threatening phone calls. On March 29, 2002, as Fernando was driving from a meeting, he was shot at, causing him to lose control of his car and crash. Diego and Fernando left Colombia for the United States a few week later and requested asylum. Fernando was granted asylum in August 2002. (Diego died of a heart attack before the asylum process concluded.)

Meanwhile, in June 2002, as her brother and father were in the United States pursuing their asylum claims, Londono received a call from Carlos, who identified himself as a member of the 30th Front of FARC. Carlos told Londono that FARC was after Diego and Fernando and if they didn't give FARC the information it wanted, Londono would be killed.

Two months later, another caller told Londono that the time had run out for Diego and Fernando to provide the information, and that Londono would pay the consequences. On August 29, 2002, while Londono and her cousin were at a supermarket, two men grabbed her and put a gun to her back. They told Londono to give them the information that her father had refused to give. Before the two men could continue, however, Londono's cousin and some other shoppers began screaming for security. The two men then hit Londono with the gun and fled.

Londono immediately reported the incident to the local police, who said they

3

would investigate but could not provide her with protection. That night, a caller on Londono's cell phone told her that she had better thank G-d for saving her life.

Londono left Colombia for the United States a few days later, on September 2, 2002, and applied for asylum, withholding of removal, and relief under the Convention Against Torture for herself and her sons the following month.

The IJ denied each of Londono's claims. As to her asylum claim, he found that the threatening phone calls and the supermarket incident did not constitute "persecution" as required by the asylum statute. Even if Londono had been persecuted, however, the IJ found that she did not show that her past persecution or fear of future persecution were based on one of the specified grounds. And, since Londono could not establish that she was entitled to asylum, she could not, by implication, meet the higher withholding-of-removal standard. Finally, because FARC was not part of or sanctioned by the Colombian government, the CAT did not apply.

Londono appealed only her asylum and withholding of removal claims to the BIA, which affirmed, without decision, the IJ's findings and adopted them as its own. Londono now appeals the same two claims here.[1]

---

[1] By not appealing the IJ's decision on her claim under the CAT, Londono has waived any relief she may be entitled to under its provisions. See Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005) ("Sepulveda does not raise any challenge in her brief to the denial of relief under the Convention Against Torture (CAT). When an appellant fails to offer argument on an issue, that issue is abandoned.")

4

## II.

The Attorney General and the Secretary of Homeland Security may grant asylum to an alien if she is a "refugee." 8 U.S.C. § 1158(b)(1)(A). A "refugee" is one

> who is outside any country of such person's nationality . . ., and who is unable and unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution <u>on account of race, religion, nationality, membership in a particular social group, or political opinion</u>.

<u>Id.</u> § 1101(a)(42)(A) (emphasis added). That is, to establish one's eligibility for asylum, an applicant must present substantial evidence that she was either persecuted or has a subjectively genuine and objectively reasonable fear of persecution, and that the persecution or well-founded fear of persecution is on account of a protected ground. 8 C.F.R. § 208.13(a)–(b); <u>Al Najjar v. Ashcroft</u>, 257 F.3d 1262, 1284 (11th Cir. 2001).

We will assume without deciding that Londono was persecuted. Under 8 U.S.C. § 1101(a)(42)(A), the question then is whether the persecution Londono suffered was on account of an enumerated ground. The IJ found that Londono had "failed to meet her burden of a well-founded fear of present or future persecution on one of the five enumerated grounds under Section 101(a)(42)(A) of the [Immigration] Act."

5

We review the IJ's findings under the substantial evidence test, which means that we "must affirm the IJ's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole." Sepulveda, 401 F.3d at 1230. "[T]he IJ's decision can be reversed only if the evidence 'compels' a reasonable fact finder to find otherwise." Id.

Londono says that the evidence does compel a contrary finding. She claims here, as she did before the IJ, that she was persecuted because of (1) the political opinion imputed to her by FARC, (2) her affiliation with ACBC, and (3) her family ties.

A.

Persecution based on one's political opinion is indeed a recognized ground for claiming asylum. See 8 U.S.C. § 1101(a)(42)(A). That includes persecution on account of a political opinion imputed to the alien by the persecutor, whether the alien actually holds the imputed opinion or not. Al Najjar, 257 F.3d at 1289 ("[a]n asylum applicant can prevail on a theory of imputed political opinion if he shows that the persecutor falsely attributed an opinion to him and then persecuted him because of that mistaken belief about his views").

The IJ's decision is supported by substantial evidence that FARC did not impute any political opinion to her. FARC was interested in Londono and her brother and father because it wanted information regarding subscriber lists and

6

serial numbers.  According to Londono's own testimony, FARC's interest in this information had everything to do with FARC's need to use ACBC's communications system and to find those subscribers who were reporting FARC's activities to the police, and nothing to do with her or her family's politics.

Imputed or otherwise, it is the political opinion of the victim, and not the persecutor, that matters for asylum claims.  Ruiz v. U.S. Att'y Gen., 440 F.3d 1247, 1257–58 (11th Cir. 2006) (per curiam).  Whatever FARC's purpose for using ACBC's propriety information, it was the information that Londono possessed, and not her viewpoint on Colombian politics or any other subject, that caused Londono to suffer FARC's wrath.

### B.

Londono next claims that she was persecuted for her "membership in a particular social group," namely ACBC.  But ACBC, a non-profit organization promoting radio communications in rural Colombia, is not a "social group," as that term has been defined by the Attorney General and the Secretary of Homeland Security.

In Matter of Acosta, the BIA, speaking for the Justice Department, said that "we interpret the phrase 'persecution on account of membership in a particular social group' to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable

7

characteristic." 19 I. & N. Dec. 211, 233 (B.I.A. 1985) (emphasis added), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439 (B.I.A. 1987). The common, immutable characteristic "must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." Id. We accord Chevron[2] deference to this definition of "social group." See Perlera-Escobar v. Executive Office for Immigration, 894 F.2d 1292, 1296 (11th Cir. 1990) ("We are . . . obliged . . . to defer to the BIA's interpretation of the applicable statute if that interpretation is reasonable.").

Participation in ACBC, though, is clearly not a characteristic Londono couldn't have changed, like her gender or her skin color or her nationality. Nor were Londono's activities with ACBC fundamental to her identity or conscience. According to her own testimony, Londono's role at ACBC was limited to promoting the radio system at local fairs four or five times a year. Unlike her father and brother, Londono had no official title with ACBC and had a full-time job elsewhere. After Diego left for the United States and ACBC lost its president, Londono stayed in Colombia for months without promoting the communications system and allowed ACBC to wither away. In other words, ACBC was not so fundamental to Londono's identity or conscience that she could not continue on in

---

[2] Chevron v. Natural Res. Def. Council, 467 U.S. 837, 104 S. Ct. 2778 (1984).

8

Colombia without it.

Londono's work for ACBC was akin to a job, which the BIA held in Acosta is not an immutable characteristic for purposes of our asylum statutes. Acosta, 19 I. & N. Dec. at 234. "[T]he internationally accepted concept of a refugee," the BIA continued, "simply does not guarantee an individual a right to work in the job of his choice." Id. That is, a job is not fundamental to one's identity. Likewise, we have no trouble finding that volunteering five times a year to sell radios is not fundamental to one's conscience or protected as part of our asylum scheme.

In any case, it does not appear from the record that Londono was persecuted on account of her membership in ACBC. According to her testimony, other members of the organization were not targeted by FARC. Only she and her father and brother were persecuted and, according to Londono, that was because they had information (or could get information) that FARC wanted. Thus, the IJ decision that it was the information Londono had, and not the organization to which she belonged, that made her (and her father and brother) a target of FARC, was supported by substantial evidence.

C.

Londono's final argument is that she was persecuted by FARC on account of her family ties. In support, Londono points to the BIA's dicta in Acosta saying that the "common, immutable characteristics" necessary to demonstrate

9

"membership in a particular social group" were those that were "innate" to the asylum applicant, "such as sex, color, or kinship ties." Acosta, 19 I. & N. Dec. at 233 (emphasis added).

Other circuits have seized on the Acosta dicta to conclude that family is a "social group" under the 8 U.S.C. § 1101(a)(42)(A) definition of "refugee." See, e.g., Iliev v. Immigration & Naturalization Serv., 127 F.3d 638, 642 n.4 (7th Cir. 1997) ("[t]his court has indirectly treated, for purposes of the well-founded fear analysis, a family as a 'particular social group'"); Gebremichael v. Immigration & Naturalization Serv., 10 F.3d 28, 36 (1st Cir. 1993) ("[t]here can, in fact, be no plainer example of a social group based on common, identifiable and immutable characteristics than that of the nuclear family"); Sanchez-Trujillo v. Immigration & Naturalization Serv., 801 F.2d 1571, 1576 (9th Cir. 1986) ("[p]erhaps a prototypical example of a 'particular social group' would consist of the immediate members of a certain family, the family being a focus of fundamental affiliational concerns and common interests for most people"). Unlike our sister circuits, we have not had occasion to decide whether family is a social group, and we see no need to do so here.

We need not decide the issue here because, even if family were a social group, the IJ's decision that Londono was not persecuted on account of any enumerated ground, which implicitly includes Londono's claim that she was

10

persecuted because of her family, is supported by substantial evidence. In Gebremichael, for example, one of the cases cited by Londono, the First Circuit said that "the link between family membership and persecution" must be "manifest." 10 F.3d at 36. That is, the asylum applicant would not have been spared persecution "but for" her membership in a targeted family.

Here, there is substantial evidence in the record to support the IJ's implicit finding that there was no "but for" relationship between Londono's family membership and her persecution. According to her own account, when Londono was held at gunpoint at the supermarket, she was with her cousin, who remained unharmed throughout the incident, even though the cousin screamed for help. Londono further testified that her cousin, who did not have any connection to ACBC, remained in Colombia even after Londono and her father and brother left, and has not been harmed since. It follows then that merely being a member of Londono's family does not subject a person to harm by FARC.

While familial relationship was a common characteristic between Londono, her brother, and her father, it was no more the cause of their persecution than wearing sunglasses or reading newspapers. The cause, according to Londono's own testimony, was the information concerning ACBC's subscribers and radio serial numbers. Shared information on rural radio communications systems, however, is not one of the protected categories under the refugee statute. Londono,

11

accordingly, is not entitled to asylum protection and we must deny her petition to review the IJ's decision on her and her children's asylum claims.

## III.

Because the IJ's decision that Londono did not have a well-founded fear of persecution if returned to Colombia on account of one of the enumerated grounds was supported by substantial evidence, it follows that she and her children cannot meet the rigorous more-likely-than-not test for withholding of removal. See Al Najjar, 257 F.3d at 1292–93 ("[w]here an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of [removal]"). We therefore deny, as well, that part of their petitions seeking review of the IJ's withholding-of-removal decision.

PETITIONS DENIED.