Lucienne Yvette CIVIL, Petitioner,

v.

**IMMIGRATION AND NATURALIZATION SERVICE,** Respondent.

No. 97–1836.

United States Court of Appeals, First Circuit.

Heard Feb. 5, 1998.

Decided May 15, 1998.

Judge's denial of her application for political asylum. Adopting the factual findings of the Immigration Judge ("IJ"), the Board found that petitioner did not have a well-founded fear of persecution. Because we find that substantial evidence supports the Board's conclusion, we affirm.

## I.

### FACTS AND PRIOR PROCEEDINGS

Petitioner Lucienne Yvette Civil sought political asylum under section 208(a) of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1158(a), on the basis that she had a well-founded fear that she would be persecuted for her political beliefs if she returned to Haiti.

Civil's asylum application, affidavit, and testimony stated the following. Born on July 12, 1976, in Croix–des–Missions, Haiti, Civil lived with her parents until the mid–1980s, when they emigrated to the United States. After her parents left Haiti, Civil lived with her grandmother, brother, aunt, and three cousins. She was fourteen years old when Jean–Bertrand Aristide was elected president of Haiti. Following Aristide's inauguration, Civil and members of her family celebrated with others in the streets, and her grandmother displayed a quilt that had an emblem on it outside of their house to show the family's support for Aristide. Subsequently, Civil graduated from a private Catholic school in 1991, and planned to attend Franco–Haitian University in Port–au–Prince. Because of demonstrations following the coup d'etat that forced Aristide from office in September 1991, the university's opening was delayed. Throughout this period, Civil did not participate in any political campaigns or marches in support of Aristide. In January 1992, she began attending classes at the university. She testified that she and other students were fearful because violent crime was rampant and because they had heard that the Ton Ton Macoutes, a paramilitary organization, were entering schools and kidnapping students. Civil also testified that a woman in her neighborhood and a fellow student—both Aristide supporters—had been raped by members of the Macoutes.

Eleanor J. Newhoff, Cambridge, MA, with whom Harvard Immigration and Refugee Clinic of Greater Boston Legal Services was on brief, for Appellant.

Terri J. Lavi, Attorney, with whom Frank W. Hunger, Assistant Attorney General, and Karen Fletcher Torstenson, Assistant Director, Washington, DC, were on brief, for Appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

Appellant Lucienne Yvette Civil appeals a Board of Immigration Appeals ("Board" or "BIA") decision affirming an Immigration

Petitioner's decision to flee Haiti was prompted by an incident that led her to believe that she was being persecuted because of her pro-Aristide views. In December 1992, as she and six friends were standing outside her home discussing President Aristide and expressing their desire to see him restored to power, a man who apparently had overheard their conversation told them that "Children shouldn't be talking about such things. There are a lot of people who don't like Aristide and they can kill you. Aristide can't do anything for you now." Civil recognized that the man, who appeared to be in his twenties, was one of the regular customers at her grandmother's bread and coffee store, which was located in the front of their home. Civil and her friends suspected that the man was a Macoute because he was wearing the type of boots that Macoutes purportedly wore, and because he warned them about expressing their views on Aristide. That same night, petitioner and her family were awakened by persons banging on the door and demanding entrance to the house. Although the persons did not identify themselves or mention Aristide, Civil and her family believed that they were Macoutes, reasoning that thieves would not bother knocking. The family remained flat on the floor for about two hours, during which time their house was stoned. The next morning, they discovered that the family's pet dog had been stoned to death.

Fearing that the Macoutes would return, Civil and her brother left their home to stay with a friend of their grandmother in Carrefour Clercine. Civil remained afraid, however, because the Macoutes were "making their way" to the part of the village where she was staying, and she thought that they might recognize her.

On January 17, 1993, fearing for her safety, Civil left Haiti and came to the United States unlawfully. Although democratic government was restored to Haiti in September 1994,[1] Civil continues to fear returning to Haiti because, she asserts, Haiti remains un-

stable, and anti-Aristide factions continue to persecute Aristide supporters.

After arriving in the United States, Civil was detained and placed in exclusion proceedings. She requested political asylum under section 208(a) of the INA, 8 U.S.C. § 1158(a), and withholding of deportation under section 243(h) of the INA, 8 U.S.C. § 1253(h). On February 21, 1995, an Immigration Judge ("IJ") found her excludable under section 212(a)(6)(C)(i) of the INA, 8 U.S.C. § 1182(a)(6)(C)(i), for attempting to procure entry into the United States by fraud or willful misrepresentation, and rejected her requests for asylum and withholding of deportation on the basis that petitioner had failed to demonstrate that she has a well-founded fear of persecution. On June 26, 1997, a three-member panel of the BIA rejected Civil's appeal from the IJ's finding of excludability and denial of asylum. Civil now appeals the Board's decision on her asylum claim.

## II.

## DISCUSSION

### A. Standard of Review

■■■ "The Board's determination of statutory eligibility for relief from deportation is conclusive if 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Gebremichael v. INS,* 10 F.3d 28, 34 (1st Cir.1993) (quoting *INS v. Elias–Zacarias,* 502 U.S. 478, 482, 112 S.Ct. 812, 815–16, 117 L.Ed.2d 38 (1992)); 8 U.S.C. § 1105a(a)(4). Reversal of the Board's determination thus depends on whether the petitioner has shown "that the evidence he presented was so compelling that no reasonable factfinder could fail to find [that he was eligible]." *Elias–Zacarias,* 502 U.S. at 483–84, 112 S.Ct. at 817. We review questions of law *de novo.*

### B. Analysis

Petitioner argues that she established eligibility for political asylum by presenting to

---

**1.** On September 19, 1994, a multi-national military force led by the United States invaded Haiti and returned Aristide to the presidency. Rene

Preval succeeded Aristide to the presidency in 1996.

the IJ consistent, detailed, and credible testimonial and documentary evidence which confirmed that her fears of persecution are well-founded. In addition, she argues that the BIA deprived her of due process by taking administrative notice of changes in Haiti's social and political conditions since she fled Haiti.

An applicant for political asylum bears the burden of showing that he or she has been persecuted, or has a well-founded fear of future persecution, on account of race, religion, nationality, membership in a particular social group, or political opinion.[2] *See* 8 C.F.R. § 208.13(b). In order to establish a well-founded fear of future persecution, a petitioner must have shown both a genuine subjective fear and an objectively reasonable fear of persecution on a protected ground. *See, e.g., Ravindran v. INS,* 976 F.2d 754, 758 (1st Cir.1992); *Alvarez–Flores v. INS,* 909 F.2d 1, 5 (1st Cir.1990). The objective component requires a showing "by credible, direct, and specific evidence ... facts that would support a reasonable fear that the petitioner faces persecution." *Ravindran,* 976 F.2d at 758 (internal citations omitted). An applicant need not establish that he or she would be singled out individually for persecution if the applicant establishes that "there is a pattern or practice in his or her country of nationality ... of persecution of persons similarly situated to the applicant," and if the applicant "establishes his or her own inclusion in and identification with such group of persons such that his or her fear of persecution upon return is reasonable." 8 C.F.R. § 208.13(b)(2); *see, e.g., Gebremichael,* 10 F.3d at 35 (holding that an applicant may establish asylum eligibility "if membership in a social group is at the root of persecution, such that membership itself generates a specific threat to the applicant") (internal quotation omitted).

Although the Board devoted the bulk of its analysis of Civil's asylum application to reciting virtually verbatim a discussion of changed country conditions set forth in an earlier opinion, *In Re E–P–,* No. 3311 (BIA, Mar. 14, 1997), it also expressly adopted that part of the IJ's opinion that held that Civil had failed to meet her burden of proving a well-founded fear of persecution on account of her political opinion. In his decision, the IJ placed weight on the fact that Civil had participated in no demonstrations or any outward manifestations of her support for Aristide. He also opined that the fact that petitioner's house was stoned on the same day that a man who was alleged to be a member of the Ton Ton Macoutes overheard petitioner and her friends discussing their support for Aristide did not constitute evidence that petitioner had been targeted because of her political beliefs. The IJ further observed that, according to the State Department, although eavesdropping by the Ton Ton Macoutes, uniformed military, or "plainclothes stool pigeons" could happen, and is sometimes alleged by Haitian asylum applicants, retribution on the basis of such incidents is "less certain." He emphasized, in addition, that the State Department had reported that, frequently, attacks attributed to the Macoutes were more likely attributable to rampant crime activity in Haiti. Concluding that "it is almost inconceivable to believe that the Ton Ton Macoutes could be fearful of the conversations of 15–year–old children," the IJ held that Civil had not established a well-founded fear of persecution.

We find that the Board's determination that Civil was not statutorily eligible for asylum was supported by reasonable, substantial, and probative evidence. The Board, via the IJ's opinion, reasonably found that petitioner's fears of persecution on account of her pro-Aristide political views were not well founded and that she had failed to establish that she reasonably fears persecution on account of her membership in a social group of Haitian youth who possess pro-Aristide political views.

As the IJ noted, petitioner belonged to no political organizations, and she never marched in pro-Aristide demonstrations. In

---

**2.** Petitioner does not assert that she qualifies for asylum based upon past persecution alone. Thus, the only issue we must address is whether substantial evidence supports the Board's and IJ's determination that petitioner failed to establish asylum eligibility based on a well-founded fear of future persecution.

addition, she was never detained, interrogated, threatened, or physically harmed by anyone in Haiti because of her private wish to see Aristide restored to power. The most that petitioner showed was that some individuals threw rocks at her family's house late one evening, after one of her grandmother's regular customers had overheard petitioner and her friends talking about their hopes that Aristide might soon return to Haiti. Although we are less willing than the IJ to accept that the attack was as likely an act of crime as an instance of political persecution, the fact remains that petitioner admitted that the individuals who stoned her house did not identify themselves or say anything about Aristide. In light of the great deference we must accord the determinations below, we will not disturb the IJ's and the Board's finding that there was no connection between the attack and petitioner's political views.[3]

■ We find, in addition, that petitioner failed to demonstrate that she reasonably fears persecution on account of her membership in a social group of Haitian youth who possess pro-Aristide political views. Although the evidence petitioner presented casts serious doubt on the IJ's contention that "15-year-old children" are unlikely targets of political violence in Haiti, petitioner failed to show that young students who hold pro-Aristide views constitute a cognizable "social group" within the meaning of the

INA, see 8 U.S.C. § 1101(a)(42)(A). The term "social group" does not encompass "every broadly defined segment of a population." Sanchez–Trujillo v. INS, 801 F.2d 1571, 1576 (9th Cir.1986). Petitioner presented ample documentary evidence that young people in Haiti were not exempted from the general violence and unrest that occurred in the aftermath of Haiti's military coup, but she presented no evidence that such persons constitute anything other than a general demographic segment of the troubled Haitian population. We thus reject petitioner's suggestion that the Board erred by not finding her eligible for asylum based on her status as a Haitian youth who supported Aristide.

Because the Board explicitly adopted the IJ's analysis of petitioner's individual circumstances, we conclude that the Board's decision—like that of the IJ—was grounded in the failure of petitioner to present sufficient evidence to establish a well-founded fear of persecution. We therefore need not address whether the Board violated petitioner's due process rights by taking administrative notice of changes in Haiti without providing petitioner an opportunity to respond.[4]

We accordingly *affirm* the decision of the BIA to deny petitioner's application for asylum.[5]

---

**3.** Although petitioner argues that the IJ erred in finding her ineligible for asylum because he made factual findings based on his "unsubstantiated *assumptions about ... the behavior and motivations of the Haitian military and paramilitary forces,*" rather than on the record evidence, we think it is readily apparent that the IJ did rely on record evidence, including petitioner's testimony, her asylum application and affidavit, and a State Department advisory report. Petitioner also would have us believe that the IJ required her to show that she fears persecution from the Haitian *government*. Because the IJ clearly recognized that an applicant is not required to show that she fears persecution from the government itself, and that non-governmental groups may instead be the source of persecution, we are at a loss to comprehend this argument. In response to petitioner's assertion that the IJ failed to recognize that asylum law does not require an applicant to have engaged in political activity, we note that the IJ's opinion in no way indicates that this aspect of the law was lost on him. The IJ's

conclusion that petitioner's lack of political involvement weakened any likelihood of a connection between her political views and the incidence of violence she experienced does not imply that he viewed past political activity as a prerequisite for establishing asylum eligibility.

**4.** We note, however, that the Board's emphasis on, and repeated recitation of, an earlier description of general changed country conditions in Haiti, see In Re E–P–, No. 3311 (BIA Mar. 14, 1997), does little to bolster its conclusions regarding particular Haitian asylum applicants.

**5.** We observe that President Clinton, in an Executive Order on December 23, 1997, directed the Attorney General to defer for one year the deportation of any Haitian national who arrived in the United States prior to December 31, 1995, or who filed for asylum before that date, and who has been continuously present in the United States since that date. It appears that Civil falls into this category.

[redacted] 

BOWNES, Senior Circuit Judge (dissenting).

I respectfully dissent. The majority affirms a decision by the Board of Immigration Appeals (Board or BIA) concluding that Lucienne Civil failed to establish her eligibility for asylum because she had not shown a well-founded fear of persecution based on her political views. At the tender age of fifteen, this young woman got a first-hand taste of political realities in Haiti. She was overheard on the street expressing her support for the return to power of ousted president Jean-Bertrand Aristide. For this, she was threatened with death in a menacing tone by a man whom she recognized and who she could reasonably believe knew who she was. That same night she was terrorized when a group of men attacked her home, demanded entry, and threw stones at the house for over an hour while Civil and her family cowered on the floor in fear for their lives. In the morning she found that her pet dog had been stoned to death.

The Board, and the majority of this panel, believed Civil's articulation of her subjective fear that she would be persecuted for her political beliefs if she returned to Haiti, but they concluded that these fears were nevertheless not "well-founded."

The Board incorporated "the reasons set forth" in the Immigration Judge's (IJ) decision to reach this conclusion, but the IJ's reasons were all legally erroneous. The IJ did not believe Civil's fears of persecution were well-founded in part because Civil had not been involved in any overt political activity, although the mob that attacked her home did not appear to care whether her activities had been overt. The IJ also relied on his own unsubstantiated speculation: despite a wealth of evidence on the subject, he found it "almost inconceivable" that the anti-Aristide forces could be concerned enough with the "conversations of children" to make it worth persecuting them. He also speculated, without any record support, that the terrorist attack on Civil's house was "more likely" the result of common criminals than of political persecutors. The IJ also emphasized the fact that Aristide was restored to power which, the IJ apparently felt (although he failed actually to consider the particular facts of the matter), meant that Civil no longer had a legitimate reason to fear persecution from the government. As will be discussed *infra*, all of these reasons are legally erroneous and insufficient to support the IJ's conclusion, and any decision based on such reasons should be reversed.

Further, the Board, on review of the IJ decision, took official notice of changes in the government of Haiti after the IJ decision, namely, the election of René Préval to succeed Aristide as president. The IJ had previously taken official notice of changes that had taken place after the hearing but before his decision. Neither the IJ nor the Board afforded Civil an opportunity to rebut the officially noticed facts or to show that any *general* changes in Haiti did not diminish her own *particular* well-founded fear of persecution. The Board specifically acknowledged that "[t]he political changes in Haiti, which include the gain of power by those whom the applicant supports, are a *significant factor* in our conclusion that the applicant has not established a well-founded fear of persecution." (Emphasis added.) A decision based in significant part on a general country condition, without addressing whether that general condition *in fact* affected the particular individual seeking asylum, should not stand. *See Perez-Alvarez v. INS*, 857 F.2d 23, 25 (1st Cir.1988) (The Board, in exercising its discretionary authority, "must consider and evaluate all relevant factors.").

In my view, the IJ's analysis gave too much consideration to unsupported speculation and legally irrelevant factors, and failed to give enough thought, if any, to the wealth of evidence (both particular to Civil and evidence of a pattern of persecution) that was submitted by Civil. The BIA's decision affirming the IJ—consisting of boilerplate and additional official notice of general material and again ignoring the evidence tending to support Civil's well-founded fear of persecution—is likewise insufficient to do justice to this case under the applicable law.[6]

6. I cannot agree with the majority that the flaws in the BIA's opinion—and its lack of valid rea-

I am concerned that the majority's affirmance of the BIA/IJ opinions in this case, and its deference to the agency's application of legal principles to the facts of this case (facts which are undisputed as to the incidents involving Civil), will encourage more such slipshod decisions by the INS. The dissenting BIA judge was the only INS judge to address the real issues and the actual facts. I agree with her: "I find the appellant's well-asserted and supported arguments on appeal to be legally correct and persuasive, while I view the speculation of the Immigration Judge and the majority to be contrary to controlling law."

### Standard of Review

The statute stipulates that the Board's "findings of fact" are conclusive if "supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a(a)(4)(1988).[7] Legal issues are, of course, reviewed *de novo*.

In reviewing Board determinations of eligibility for asylum, we have applied "normal principles of administrative law governing the role of courts of appeals when reviewing agency decisions for substantial evidence." *Cordero–Trejo v. INS*, 40 F.3d 482, 487 (1st Cir.1994). Under those principles,

"[t]he Board's findings must ... be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses

or its informed judgment on matters within its special competence or both."

*Id.* (alterations in original) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 490, 71 S.Ct. 456, 465–66, 95 L.Ed. 456 (1951)).[8]

Here, there is no dispute as to the facts. The Board found Civil to be credible, and found the relevant facts to be as she testified—including the December 1992 incident on the street, which entailed a death threat in menacing tones, and the stoning of her house that same night. The IJ and Board also credited Civil's subjective fear of persecution based on her pro-Aristide political opinions, a fear engendered by the verbal threat and the stoning. Because there is no factual dispute, the majority's deference to the Board's fact-finding does not support an affirmance of the BIA decision. Where, as here, the Board applies the wrong legal standard and makes other legal errors, it is not enough for the majority to find that the Board *could have* cobbled together sufficient facts to support its conclusion *if* it had applied the proper standards. Because the Board never did apply the correct standards, we do not know what it, as a reasonable factfinder, would have concluded in those hypothetical circumstances. I would reverse and direct a decision the other way, based on this record, but at the very least, this court should reverse and remand for a proper ad-

---

7. When reviewing an IJ decision, the Board is "not bound by the Immigration Judge's conclusions, but rather has plenary power to review the record *de novo* and to make its own independent determinations on questions of law and fact." *Matter of Lok*, 18 I & N Dec. at 106. Thus, in reviewing Civil's claim, the BIA was empowered—indeed, required—to exercise its plenary power to evaluate the evidence submitted by Civil under the appropriate legal standard.

8. We stated the purpose of this rule as follows:

This is to ensure that an agency "keeps within reasonable grounds." *Id. See Ghebllawi v. INS*, 28 F.3d 83, 85 (9th Cir.1994) (invoking *Universal Camera* standard to emphasize that Board of Immigration Appeals is not "a unique kind of administrative agency entitled to extreme deference").

*Cordero–Trejo*, 40 F.3d at 487.

---

sons—can be ignored merely because the Board perfunctorily adopted the IJ's reasons as its own. Apart from the fact that the IJ's reasons are themselves baseless, the Board has a duty adequately to review the IJ's decision for support in the record. *See Matter of Lok*, 18 I & N Dec. 101, 106 (BIA 1981). Certainly a perfunctory adoption of "the reasons set forth" in the IJ decision should not give this court, on judicial review, much confidence in the thoroughness or care of the BIA's scrutiny of the record, especially of the evidence Civil submitted such as reports by the State Department, the United Nations, and human rights groups. Indeed, the Board essentially admitted that it failed to review the record here with any care: the Board emphasized that "[t]he political changes in Haiti, which include the gain of power by those whom the applicant supports, are a significant factor in [the Board's] conclusion that the applicant has not established a well-founded fear of persecution."

judication applying the correct legal standards.

The questions in this case are questions of law: (1) were there enough facts to establish a "well-founded" fear of persecution (a mixed question of law and fact which is treated as a question of law); (2) was it error for the Board to consider and give controlling weight to the change in general conditions in Haiti without evaluating whether that general change had any effect on the likelihood that this particular individual would be persecuted based on her political opinions if she returned to Haiti, such as would make her continuing subjective fear of persecution no longer well-founded? I would answer both questions in the affirmative and therefore reverse.

### Well–Founded Fear of Persecution

An alien may be granted asylum in the discretion of the Attorney General if the alien is a "refugee." *See* 8 U.S.C. § 1158(a). Refugee is defined as any alien who is unwilling or unable to return to his country "because of ... a well-founded fear of persecution on account of race, religion, nationality membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). The well-founded fear has both a subjective and an objective component. *See Cordero–Trejo*, 40 F.3d at 491 (citing *INS v. Cardoza–Fonseca*, 480 U.S. 421, 430–31, 440, 107 S.Ct. 1207, 1212–13, 94 L.Ed.2d 434 (1987)); *Alvarez–Flores v. INS*, 909 F.2d 1, 5 (1st Cir. 1990); *Ravindran v. INS*, 976 F.2d 754, 758 (1st Cir.1992). "Although objective factors are relevant, there is under the statute an 'obvious focus on the individual's subjective beliefs.'" *Perez–Alvarez*, 857 F:2d at 25 (quoting *Cardoza–Fonseca*, 480 U.S. at 431).

The subjective component requires that the asserted fear be genuine. *Ravindran*, 976 F.2d at 758. There is no dispute about this element in the present case; the IJ found Civil's testimony on this subject to be credible. The objective component, on the other hand, contemplates that the applicant show "'by credible, direct, and specific evidence, ... facts that would support a reasonable fear that the petitioner faces persecu-

tion.'" *Id.* (quoting *Alvarez–Flores,* 909 F.2d at 5).

But the degree of likelihood of persecution that must be shown is not high. "[T]o show a 'well-founded fear of persecution,' an alien need not prove that it is more likely than not that he or she will be persecuted in his or her home country." *Cardoza–Fonseca,* 480 U.S. at 449–50, 107 S.Ct. at 1222. The applicant for asylum meets her burden if she shows that there is a "'reasonable possibility'" that she will be persecuted on account of her political opinion. *Id.* at 440, 107 S.Ct. at 1217–18 (quoting *INS v. Stevic,* 467 U.S. 407, 425, 104 S.Ct. 2489, 2498–99, 81 L.Ed.2d 321 (1984)). This low threshold showing applies, even though the final decision as to whether to grant or deny a refugee asylum is a matter of discretion, "left for the Attorney General to decide." *Id.* at 450, 107 S.Ct. at 1222. As we have stated, "[i]f one out of ten adult males in the petitioner's country of origin is either in danger of death or of incarceration in 'some remote labor camp,' the petitioner has 'a well-founded fear' of persecution." *Perez–Alvarez,* 857 F.2d at 25 (quoting *Cardoza–Fonseca,* 480 U.S. at 431, 107 S.Ct. at 1212–13); *Blanco–Comarribas v. INS,* 830 F.2d 1039, 1042 (9th Cir.1987); *cf. Cardoza–Fonseca,* 480 U.S. at 449, 107 S.Ct. at 1222 (referring to the "longstanding principle of construing any lingering ambiguities in deportation statutes in favor of the alien.").

The reasonableness of Civil's subjective fear is to be determined by the consistency, detail and specificity of the objective evidence she presented which provides a plausible account of the basis for the fear and shows that there is a "reasonable possibility" of persecution. *See Cardoza–Fonseca,* 480 U.S. at 440, 107 S.Ct. at 1217–18. The Board has set forth four factors which must be satisfied to establish that her fear of persecution is well-founded: (1) she possesses a belief or characteristic that the persecutor seeks to overcome; (2) the persecutor is aware or could become aware that she possesses the belief or characteristic; (3) the persecutor has the capability of punishing her; and (4) the persecutor has the inclination to punish her. *See Matter of Mogharra-*

*bi,* 19 I & N Dec. 439, 446, 1987 WL 108943 (BIA 1987).

Based upon my reading of the record, Civil meets this standard. She was talking with a friend about her desire for the speedy return of then-deposed president Aristide when a man approached her and warned her in a menacing tone not to talk about "these things. There are a lot of people who don't like Aristide and they can kill you. Aristide can't do anything for you now." The man wore the kind of boots that the Ton Ton Macoutes usually wear. Civil reasonably believed, based on the circumstances of the meeting and the exchange that occurred within it, that this man was associated with the anti-Aristide forces, possibly a member of the paramilitary or an informant for the Ton Ton Macoutes.[9]

The very same night, at about 3:00 a.m., a group of men gathered outside her house and demanded entry. The family lay flat on the floor in the hopes of avoiding gunfire, while the men threw rocks at the house for an hour or more. The family waited until morning to get up from the floor and go outside, where Civil found that her pet dog had been killed by stones thrown by the men. Civil reasonably believed that the group of men who attacked her house were also connected to the anti-Aristide forces, and that this entire attack was a planned sequel to the warning and threat by the man who had overheard her pro-Aristide comments earlier that day.

As the dissenting BIA judge noted, no entities in Haiti are reported to engage in this type of attack, other than the former military or right wing, anti-democratic forces such as the FRAPH, each of which have an established political agenda, which includes silencing persons such as Civil. (Dissent at 3.) It was after this attack that Civil's family decided that she should leave Haiti for her safety.

Civil's fear of persecution was eminently "reasonable," in light of the severity of the attack on her house and the timing of it. *See Cardoza–Fonseca,* 480 U.S. at 440, 107 S.Ct. at 1217–18. Any reasonable person in Civil's circumstances would have recognized and feared that the almost instant retribution inflicted upon her was because of her stated enthusiasm for the return of Aristide to power.[10] The man who overheard her and threatened her was a regular customer at her grandmother's store, so he knew exactly who she was and where to find her. Civil has offered uncontested evidence, which the IJ found entirely credible, regarding the events giving rise to her fear of persecution. The IJ accepted her rendition of those events, as well as her subjective fear of persecution.

In addition to her own testimony about this personal incident,[11] Civil offered documentary evidence of political persecution of elementary and secondary students by the Haitian military and paramilitary forces. *See* Dennis Nurske, Lutheran Immigration

---

9. The term "Ton Ton Macoutes" refers, in a precise sense, to the paramilitary group maintained by the Duvalier regime (1957–86) that engaged in campaigns of terror against opponents of that regime. After Duvalier was overthrown, the organization ceased to exist formally. After the coup in 1991 ousted the elected government of Aristide, former members of the Macoutes resurfaced in various informal incarnations. Today the term "Ton Ton Macoutes" is used informally to refer to a wide range of groups, loosely connected with the Haitian military and paramilitary forces (not all of whom actually had been members of the infamous and bloody Macoutes under Duvalier), and engaged in perpetrating political violence and intimidation in Haiti. *See* Americas Watch, *Return to the Darkest Days: Human Rights in Haiti Since the Coup* (December 30, 1991). I will, in this opinion, use the term "Ton Ton Macoutes" in this informal sense.

10. This causal link is not made unreasonable merely because the men who terrorized Civil on that afternoon and night did not announce their sponsors verbally or through any military or official garb. As recognized by a State Department dispatch contained in the record, "[p]aramilitary personnel in civilian clothes . . . conduct most of *the intimidation and violent repression for both* the police and the army." Part of the reason the Haitian people are so terrified is that no one can be sure who might turn them in, harass them, or even kill them because of their pro-Aristide views.

11. The applicant need not demonstrate that she has been singled out for persecution, but may qualify for asylum if she establishes that there is a pattern or practice in her country whereby groups of persons similarly situated to the applicant are persecuted on account of one of the five enumerated grounds. 8 C.F.R. § 208.13(b)(2)(i).

and Refugee Service, United States Catholic Conference/Migration and Refugee Service, *At Special Risk: The Impact of Political Violence on Minors in Haiti* (July 1992) (detailing the consistent and systematic political retribution directed at young Haitian adolescents). The report points out that children and youth in Haiti played a major role in Aristide's election campaign and in political activities both before and after the 1991 military coup that drove Aristide out of office. As a result, elementary and secondary school children have become highly politicized and are regarded by the military as a significant threat, thus placing them at special risk. *Id.* ("Children and young adolescents have ... been consistently and methodically singled out by the army."). "Children have been routinely targeted for violence in reprisal for their political beliefs, expressed or imputed, and for the political opinions and activities of family and community members." *Id.* "Children also appear to have been targeted as punishment for a perceived political opinion imputed from their peer association, presence in the classroom, affiliation with a pro-Aristide neighborhood, or membership in a politicized family." *Id.* In many rural areas, because of the intimacy of villages and knowledge of who holds opposing viewpoints, "the great majority of young people in the region [were] either arrested or in hiding." *Id.* Even the INS recognized that, in order to suppress the political activities of school-age children, the military had "prohibited student meetings, arrested and detained students, and brutally beaten and in some cases tortured suspected student activists." Memorandum from John W. Cummings, Acting Director, INS Office of International Affairs, to INS Asylum and Refugee Divisions, *Re: Considerations When Adjudicating Haitian Refugee/Asylum Applications* (March 9, 1993) ("Cummings Memorandum").

Civil also offered reports of various human rights organizations, as well as newspaper articles, detailing the Haitian military and paramilitary forces' brutal and widespread persecution of persons believed to support Aristide. The United States State Department recognized that, after the 1991 military coup, "[t]he military and the de facto government promote[d] repression and terror, sanctioning widespread assassination, killing, torture, beating, mutilation, and rape." United States Department of State, *Human Rights in Haiti* (September 13, 1994). In particular, demonstrations in support of Aristide were attacked by the Ton Ton Macoutes, causing hundreds of deaths. *Id.* The State Department concluded that, "[a]s we approach[ed] the third anniversary of the coup [overthrowing Aristide], the human rights situation ha[d] worsened." *Id.* It is noteworthy that these words were written just five months before the IJ's decision in the present case.

Civil offered human rights reports by the United Nations, the State Department, Amnesty International, and other international human rights organizations documenting the Haitian military and paramilitary forces' widespread use of rape and sexual violence as a means of political terror in Haiti. The Board itself, in *Matter of D–V–*, Interim Decision 3252 (BIA 1993), recognized that young women in Haiti were being subjected to rape as a form of politically motivated persecution. Civil offered evidence that two women in her own neighborhood had been raped by paramilitary forces who invaded their homes in the middle of the night and violently attacked them. Both were Aristide supporters. These incidents, grounded in objective reality, contributed to Civil's fear that she too would be similarly persecuted.

The record includes reports—from sources ranging from the State Department to the United Nations to the INS to Human Rights Watch—indicating that persons overheard in the street protesting political conditions had been the victims of politically motivated retribution; that thefts, robberies, and rapes by Ton Ton Macoutes were common in areas where pro-Aristide supporters were situated, although the "untangling of motives of lawbreakers is difficult." *See, e.g.,* State Department letter dated March 11, 1994, at 3.

Civil also offered evidence documenting the continuing persecution of those opposed to the Haitian military even *after* Aristide's return to power in October 1994. We recent-

ly referred to some of the same reports that Civil points to here, finding that "political assassinations and intimidation of Aristide supporters persist[ed]" after the September 1994 return of Aristide to power. *Fergiste v. INS*, 138 F.3d 14, 18–19 (1st Cir.1998). A memorandum issued by the INS's own Asylum Division concluded that Aristide's return had not resulted in durable, fundamental change. Memorandum from Gregg Beyer, Director, INS Asylum Division (October 27, 1994) ("Beyer Memorandum"). Evidence from reliable authorities indicates that the government was not sufficiently stable to control the anti-Aristide forces and to prevent them from killing and maiming with impunity, even after Aristide was restored to the presidency. This was especially true in rural areas. Nor is this surprising. "In countries with long histories of severe political repression and serious violations of fundamental human rights, the possibility of abuse and persecution continues at local levels even when official policies and/or composition of governments at the top have changed." *Id.*

We have previously recognized "the importance of documentary evidence" such as I have just described, "both in providing a plausible context for an asylum applicant's claim, and in making credibility assessments." *Cordero–Trejo*, 40 F.3d at 491. It is equally useful in evaluating whether her subjective (undisputed) fear of future persecution is well-founded. Moreover, "[t]he Board nowhere suggests that this evidence is unreliable, and [I] note that it comes from sources, such as the State Department and internationally recognized non-governmental organizations, generally regarded by courts of law as reliable." *Id.* at 491 n. 6. Here, as in *Cordero–Trejo*, "[b]oth the [immigration]

judge and the Board failed to address much of [the applicant's] evidence. With all deference, it is far too extensive and significant to be dismissed with a general statement," *id.* at 492, or, in Civil's case, with no statement at all. This failure, and the Board's failure "to engage in the inquiry necessitated" by law, "unreasonably eviscerate[d] [the applicant's] attempt to establish ... the objective ... element[ ] of [her] asylum claim." *Id.* at 491–92; *see Perez–Alvarez*, 857 F.2d at 25 ("[T]he Board in exercising the discretionary authority conferred upon it by Congress cannot proceed arbitrarily and must consider and evaluate all relevant factors.").

There being no factual issues genuinely in dispute, the only question is a legal one: do the totality of facts rise to a sufficient level of threat to establish that Civil's fear is "well-founded"? I believe they do, whether the standard is ten percent, *Perez–Alvarez*, 857 F.2d at 25, or somewhat greater.[12]

It was quite reasonable for a person who experienced what Civil did—an attack on her home on the very night after she was overheard expressing her pro-Aristide views and after a stranger warned her in menacing tones about the deadly consequences of such expression—viewed in the context of the situation in the country at large, to fear that, if she is returned to Haiti, she will be persecuted on account of her political beliefs.[13] Her fear is even more reasonable if we take into account the subjective impact these events would likely have on the mind of Civil as a young teenager.[14] *See Kahssai v. INS*, 16 F.3d 323, 329 (9th Cir.1994). The terror that she experienced probably had a far greater and more long-lasting impact on someone of her age than it would have had on a full-grown adult. The IJ and the Board did not

---

12. The standard is, in any event, less than the fifty-one percent standard of "more likely than not." *See Cardoza–Fonseca*, 480 U.S. at 449–50, 107 S.Ct. at 1222–23.

13. *INS v. Elias–Zacarias*, 502 U.S. 478, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), is not to the contrary. That case goes off on an insufficient showing that petitioner's political views were a factor; even if he had a well-founded fear of persecution, it would not be "persecution on account of [his] political opinion." The authorities there had other reasons to dislike him and to persecute him. Here, in contrast, Civil offered

credible evidence that her political views were known to the man who accosted her, and that those views were the basis for his threat, which immediately preceded the assault on her home. What the respondent appears to dispute here is that Civil can reasonably fear future persecution at all, because of the stabilizing effect of the U.S. invasion and ascension of Aristide to the presidency.

14. Physical harm is not the touchstone for establishing persecution. *Cordero–Trejo*, 40 F.3d at 488 (citing *Sotelo–Aquije v. Slattery*, 17 F.3d 33, 37 (2d Cir.1994)).

consider this factor at all. *See also* Beyer Memorandum to INS Asylum Division (Even more significant than the ongoing killings is "the continuing, often 'invisible,' presence of these perpetrators of past violations who have simply, and probably only temporarily, retreated into the background."). In short, based on both subjective and objective factors, no reasonable fact-finder could have concluded that Civil's fear of persecution was not well-founded. *See Cordero–Trejo,* 40 F.3d at 491.

This is not a case where a petitioner is pointing to random or widespread violence affecting all citizens and trying to bootstrap that into a claim of persecution based on her political beliefs under the immigration laws. *See Ravindran v. INS,* 976 F.2d 754, 759 (1st Cir.1992) (citing *Rodriguez–Rivera v. United States Dep't of Immigration & Naturalization,* 848 F.2d 998, 1005 (9th Cir.1988); *Mendez–Efrain v. INS,* 813 F.2d 279, 282–83 (9th Cir.1987)).[15]

The IJ decision relied heavily on, and the INS makes much of, the fact that Civil did not "belong to [any] political organizations" and did not march in pro-Aristide demonstrations to make manifest her political opinions.[16] But this does not affect her reasonable fear of persecution, and it certainly does not necessarily lead to the Board's conclusion that Civil's fear of persecution is not well-founded. "Although those in leadership or prominent positions are possibly at greater risk due to their greater visibility, *lack of prominence does not remove the possibility of being at risk.* This is true especially considering the fact that Haitian society is organized into small communities." Cummings Memorandum to INS Asylum Division (emphasis added). Whatever actions she did not take, Civil apparently did enough to warrant being threatened for her statements, to have her house stoned in the middle of the night (at 3:00 a.m.), and to have her dog killed. What more is necessary in order for a person's fear to be "reasonable"? The fact that she was cautious enough (because of a reasonable fear of persecution) to try not to reveal her political sympathies in any overt manner—thereby protecting her from the fate of her raped and abused friends—does nothing to undermine the legitimacy of her fear *now.* That is because now, after the incident in December 1992, the anti-Aristide forces know her sympathies lie with Aristide and those same friends. Those forces threatened her with death immediately after she expressed her views, and that same night they terrorized her sufficiently for her to know that their threats were real.[17]

The majority is "at a loss" to understand Civil's argument that she need not show that she fears persecution *from the government.* The reason she makes that argument is that the BIA's main argument for rejecting her application is that the government of Haiti has changed, that Civil's idol, Aristide, and his followers have returned to government power. The IJ's reasoning certainly implies that Civil was required to show that she

---

**15.** In *Ravindran,* we discounted petitioner's claim that he genuinely feared persecution on account of his political opinions in part because he remained in Sri Lanka for so long after the alleged incidents of persecution against him. 976 F.2d at 760 n. 4. He did not leave the country until more than a year after his last of several detentions, and he did not seek asylum until, after working on a ship for five months, with stops in several ports, he was finally arrested in the United States. We also pointed to the fact that petitioner "obtained a passport and exit visa" before leaving the country without incident. *Id.* at 760.

**16.** According to Civil, her decision not to engage in overt political activity was due to pressure from her grandmother, with whom she lived and who was afraid that the family would be subjected to political violence if any of them made any overt expression of support for Aristide.

**17.** The majority argues, in footnote 3, that "petitioner's lack of political involvement weakened any likelihood of a connection between her political views and the incidence of violence she experienced." Perhaps the majority is correct that this does not *necessarily* imply that the IJ viewed past political activity as a prerequisite for establishing asylum eligibility. But the argument misunderstands the legitimate basis for Civil's fear of persecution: whether or not she made herself an enemy of the Macoutes by engaging in overt political activity, she has reason to fear that the Macoutes view her as an enemy because of what their informant overheard her say, and she has reason to fear that they have the capability and the inclination to punish her for those beliefs if she returns to Haiti. That is the test, *see Matter of Mogharrabi,* 19 I & N Dec. 439, and I think the IJ and BIA are too glib in sidestepping the fact that Civil has satisfied that test.

fears persecution from the Haitian *government*. Civil argues as she does because the INS obviously does not "get it"; Haiti is not a safe place for a known Aristide supporter to return to, even though the INS is correct that Aristide's party is in nominal control of the government. One may have a well-founded fear of persecution by a group that the government is unwilling or unable to control. What matters is whether the petitioner's fear of persecution is based on one of the statutory grounds. *Matter of Maldonado–Cruz*, 19 I & N Dec. 509, 1988 WL 235438 (BIA 1988); *see, e.g., Bolanos–Hernandez v. INS*, 767 F.2d 1277 (9th Cir.1984). As we put it in *Cordero–Trejo*, 40 F.3d at 490, Civil "is not claiming to have been targeted and threatened by the civilian government, but by a shadowy, extra-legal entity associated with the [Haitian] military." As the State Department recognized, in a February 1994 dispatch contained in the record, "[p]aramilitary personnel in civilian clothes ... conduct most of the intimidation and violent repression for both the police and the army" in Haiti. And the documentary evidence clearly establishes that the Haitian government was unable to control the paramilitary forces and their allies, including the Ton Ton Macoutes, who continue to terrorize the Haitian people. *See, e.g.,* Human Rights Watch/Americas National Coalition for Haitian Refugees, *Terror Prevails in Haiti: Human Rights Violations and Failed Diplomacy* (April 1994) (quoting United Nations/Organization of American States International Civilian Mission Report).

### Reliance on Speculation

The IJ committed another legal error by basing his conclusion in significant part on his own unsubstantiated speculation and ignoring the substantial evidence to the contrary that existed in the record. We have unequivocally rejected the substitution of the IJ's idea of how other societies operate as a basis for judging the likelihood of persecution of a particular individual. *See Cordero–Trejo*, 40 F.3d at 490 (finding it "apparent that the IJ did not consider Cordero's testimony and evidence," despite the legal "require[ment]" that he consider it if credible in light of general country conditions (citing 8

C.F.R. § 208.13(a))); *Perez–Alvarez*, 857 F.2d at 24 (finding that nothing in the record sustains the IJ's assumptions other than "perhaps his general perception of life or political conditions in El Salvador which may or may not be grounded in fact").

Here, the IJ's decision relied on at least two types of speculation. First is his speculation that the anti-Aristide forces could not possibly have been interested in the political views of a 15–year–old child like Civil. He wrote that "it is almost inconceivable to believe that the Ton Ton Macoutes could be fearful of the conversations of children." But the record contains absolutely no evidence that the military or antiAristide forces felt teenagers were not a threat to opponents of Aristide.

Indeed, as demonstrated *supra*, the record evidence is to the contrary: the anti-Aristide forces viewed pro-Aristide young people as an important source of support for Aristide, and they went to great lengths to intimidate those young people through terror and torture. The objective evidence of record indicates that the military and anti-Aristide forces in Haiti did not spare minors or differentiate among their victims based on age or gender. Record evidence, including a letter from the United States Department of State, dated March 11, 1994, confirms that in the summer of 1992, there were serious confrontations between the pro-Aristide students and police employed by the forces which had ousted Aristide. Further disturbances at the universities forced them to be closed in December 1992, the very period when the incidents reported by Civil occurred. Moreover, documents in the record establish that similarly situated Haitian students have faced a pattern of brutal persecution ranging from arrest to murder, further substantiating Civil's fear that she faces a substantial risk of persecution if returned to Haiti.

We have held in past cases that "deference [to the Board] is not due where findings and conclusions are based on inferences or presumptions that are not reasonably grounded in the record, viewed as a whole." *Cordero–Trejo*, 40 F.3d at 485, 487 (remanding, because "the findings underlying the Board's

conclusion that [applicant] is ineligible for asylum are not supported by substantial evidence") (citing *Universal Camera*, 340 U.S. at 491, 71 S.Ct. at 466). That is the case here. For the IJ to rely on his own speculation and assumptions, and to ignore the substantial factual evidence from objective sources that his assumptions were inaccurate, constituted legal error. And, to the extent the BIA affirmed the IJ "for the reasons set forth" in his decision, the BIA committed legal error too, relying on speculation that was unreliable and ignoring or failing to credit detailed evidence from reliable and objective sources. This court certainly should not rely on the IJ's factual conclusions in this case.

The IJ also speculated that the attack on Civil's home was "more likely" the [random] act of common criminals than an act of paramilitary forces intended as political persecution.[18] But there is no reason to believe that this second instance of IJ speculation has a factual basis. As noted *supra*, no entities in Haiti were reported to engage in this type of attack, other than the former Ton Ton Macoutes and their successors. There is no evidence in the record that the Macoutes invaded and stoned people's homes in the middle of the night for purely criminal motives. To the contrary, there is ample evidence that the paramilitary Ton Ton Macoutes and "attachés" engaged in this type of persecutory practice as a means of silencing and assessing vengeance against Aristide supporters. Moreover, the IJ's speculation that the 3:00 a.m. attack on Civil's home might have been the work of "common criminals" is absurd on its face. A common criminal does not knock on the door and demand to be let into the house. The question, in any event, is not what an administrative law judge sitting in the safety of the United States can choose to believe; the question is what a young person, who has been forced to hide under the bed in the middle of the night, in terror of being killed, would think

about her safety if she were to return home. The IJ's "common criminals" speculation, like the speculation about "the conversations of children," constituted legal error, and undermined the reliability of his decision. It also therefore undermined the reliability of the Board's decision which simply incorporated by reference the IJ's reasoning.

The majority discounts the error resulting from the Board's and IJ's speculation, stating "we think it is readily apparent that the IJ did rely on record evidence, including petitioner's testimony, her asylum application and affidavit, and a State Department advisory report." *Ante* at 56 n. 3. But the fact that the IJ mentioned some record evidence does not mean that he did not rely on unsubstantiated assumptions as well. He explicitly stated that he did rely on a number of such assumptions, such as his "common criminals" speculation and his reliance on general changes in Haiti apparently assuming that such general changes would eliminate the possibility that this petitioner would be persecuted. And the Board, in affirming the IJ, acknowledged that the same general political changes "are a significant factor in our conclusion that the applicant has not established a well-founded fear of persecution."

Thus, Civil has offered evidence to establish sufficient facts to satisfy the legal test for having a well-founded fear of persecution.

### Official Notice

In addition, she is correct that the BIA's decision should be reversed as a matter of law because that decision was made on the basis of the IJ's and the Board's taking official notice of changes in general country conditions. That official notice gave rise to two separate legal errors. As this court emphasized only last month, "the official notice of changed country conditions" cannot be enough to "counter[] the specific evidence of persecution that [a particular petitioner] has

---

18. The majority states, "Although we are less willing than the IJ to accept that the attack was as likely an act of crime as an instance of political persecution, the fact remains that petitioner admitted that the individuals who stoned her house did not identify themselves or say anything about Aristide." *Ante* at 56. The fact that the

terrorists "did not identify themselves or say anything about Aristide" cannot seriously be expected to make a reasonable person feel any less afraid of persecution, especially when the terrorist attack followed so closely on the heels of a death threat based explicitly on her overheard comments in support of Aristide.

presented." *Fergiste v. INS*, 138 F.3d 14, 18 (1st Cir.1998). In a separate and independent error, discussed *infra*, the Board also failed to give Civil any warning that it would be considering this extra-record evidence and failed to give her an opportunity to respond before the final decision issued. *See Gebremichael*, 10 F.3d at 37.

### A. General Versus Specific Facts

First, the IJ and the Board took notice of a generalization, without any evidence that there has been any specific diminution in the threat to this particular individual petitioner. As the majority notes, the BIA "devoted the bulk of its analysis of Civil's asylum application to reciting virtually verbatim a discussion of changed country conditions set forth in an earlier opinion." [19] *Ante* at 55. While taking official notice of the *general* changes in country conditions in Haiti, the Board gave absolutely no consideration to the question whether those general conditions made any difference (much less sufficient difference) to Civil's particular situation. The Board's implicit assumption, that the particular necessarily follows from the general, is also factually inaccurate: despite the return of Aristide and then Préval to head Haiti's government, the former Ton Ton Macoutes continue to terrorize Aristide's friends and supporters.

As we have held, "[i]n keeping with standard principles of administrative procedure and in the absence of any prohibition in the INA itself, the Board has the discretion to take 'official' or 'administrative' notice of extra-record *legislative* facts." *Gebremichael*, 10 F.3d at 37 (emphasis added) (citing 3 Kenneth C. Davis & John P. Wilson, *Administrative Law Treatise* § 15, at 132–217 (2d ed. 1980) ("*Administrative Law Treatise*")). "Legislative facts are those which 'do not

usually concern the immediate parties but are the general facts which help the tribunal decide questions of law and policy and discretion.'" *Id.* at 37 n. 25 (quoting 2 *Administrative Law Treatise* § 12:3, at 413). "Thus, the Board is free to take official notice of facts such as a change in government in an applicant's home country." *Id.* at 37.

"In contrast, 'adjudicative facts usually answer the questions of who did what, where, when, how, why, with what motive or intent.'" *Id.* at 37 n. 25 (quoting *Administrative Law Treatise* § 12:3, at 413). These more particularized facts pertaining to the individual parties are not the kind of facts of which the agency may take official notice. Yet that is exactly what the Board would have to do in order to have made a proper determination in the instant case.

As a matter of law, it is not enough for the Board to find, as an officially noticed fact, that Aristide was restored to power and therefore that the "general country conditions" in Haiti had changed.[20] A change in government cannot, without more, support a denial of political asylum. The Board must find, based upon substantial evidence, that the change has actually resulted in an elimination or reduction of persecution of the particular applicant for asylum, or of persons similarly situated; an applicant is entitled to "careful, individualized" consideration of such evidence in the context of the applicant's claims. *See Llana–Castellon v. INS*, 16 F.3d 1093, 1096, 1098 (10th Cir.1994) (remanding to BIA a denial of asylum based upon a "rote" finding of changed country conditions); *see Rhoa–Zamora v. INS*, 971 F.2d 26, 34 (7th Cir.1992). As the Tenth Circuit cogently stated,

The use of official notice [of changed country conditions] does not substitute for an

---

19. Herc, as in *Gebremichael v. INS*, 10 F.3d 28 (1st Cir.1993), there were two separate instances of taking official notice of facts not in the record, each time without affording the petitioner an opportunity to be heard. In the present case, the IJ noticed the changed country conditions that had occurred prior to the date of his decision (the restoration of Aristide to the presidency), and later the BIA officially noticed additional changes subsequent to the IJ decision (the ascension of Préval to succeed Aristide).

20. That is what the IJ officially noticed. The BIA took the additional step of officially noticing further changes in country conditions, namely, that René Préval had been elected to succeed Aristide in 1996. This further finding is fraught with the same difficulties as discussed in the text regarding the IJ's finding, and possibly additional difficulties.

analysis of the facts of each applicant's individual circumstances. Uncontroverted facts may be inapplicable to or of limited probative value in individual cases and the Board must remain open to this possibility. The petitioners are therefore right to demand that the BIA engage in a careful, individualized review of the evidence presented in their applications and hearings. *Llana–Castellon,* 16 F.3d at 1098 (quoting *Kaczmarczyk v. INS,* 933 F.2d 588, 594–95 (7th Cir.1991)). The court found that the Board there (as here) inferred a de facto change in country conditions from a merely de jure change in government, and failed to consider that the government does not enjoy full control and that anti-government groups "are still a force to be reckoned with." *Id.* at 1097; *Castillo–Villagra v. INS,* 972 F.2d 1017 (9th Cir.1992) (Although the Board may take administrative notice of the fact of a change in government, it may not, without a hearing, conclude that the change has eliminated the danger to the applicant.)

We reached the same conclusion only last month. In *Fergiste,* we held:

> [T]he Board's administrative notice of changed country conditions did not suffice to show that [the petitioner] *himself* no longer had a reasonable fear of future persecution. *Abstract* "changed country conditions" do not automatically trump the *specific* evidence presented by the applicant. Rather, changes in country conditions must be shown to have negated the *particular* applicant's well-founded fear of persecution.

138 F.3d at 19–20 (emphasis added, footnote omitted); *see* 8 C.F.R. § 208.13(b)(1)(i). In *Fergiste,* referring to some of the same reports that Civil points to here, we found that "political assassinations and intimidation of Aristide supporters persist[ed]" after the September 1994 return of Aristide to power. 138 F.3d at 19. There, we noted that, although the petitioner "presented hundreds of pages of documentary evidence that either contradicted the Board's conclusions or placed them into question[,] ... the Board mentioned none of them in its analysis, nor did it discuss how or whether [the petitioner's] particular situation may be affected by the changed country conditions that it recognized." [21] 138 F.3d at 19.

Similarly, here, the question the Board should have answered was whether Civil in particular had a well-founded fear of persecution. Neither the Board nor the IJ did anything whatsoever to ascertain whether the general political change in Haiti made any difference to Civil's well-founded fear of persecution from the Ton Ton Macoutes and their sympathizers.

If, in the instant case, the Board or IJ had made any effort to look into this question, they would have found an abundance of evidence supporting Civil's claim that she still had reason to fear persecution. As discussed *supra,* despite the change at the top of the government in Haiti, members of the police force and civilian former Ton Ton Macoutes continued to prowl the country intimidating, torturing and killing Aristide supporters and their families. In short, the deadly battle for control of Haiti continued to be waged even after the general changes occurred at the top of the government. The Board's failure even to ask the particular question of Civil's personal well-founded fear of persecution, i.e., the Board's leaping to the conclusion of denying her petition simply based upon the general change in country condition, was erroneous as a matter of law and should be reversed. It is not a legislative fact of which the Board was permitted to take official notice, nor did the Board make any attempt to determine objectively a particularized finding based on such fact. It was particularly unfair for the IJ to base his decision on changed country conditions stated in excerpts of the U.S. State Department Country Reports on Haiti, and then to ignore the voluminous documentary evidence presented by Civil in support of her case. She offered reports of reputa-

---

**21.** "That the Board ignored [the petitioner's] individual situation is further supported by the fact that the Board's majority opinion takes the heart of its analysis virtually verbatim from the language of an earlier opinion, *In Re E–P–,* No. 3311 (BIA Mar. 17, 1997)." *Fergiste,* 138 F.3d at

19–20. In the instant case, as the majority recognizes, "the Board devoted the bulk of its analysis of Civil's asylum application to reciting virtually verbatim a discussion of changed country conditions set forth in" the very same earlier opinion. *Ante* at 55.

ble, objective organizations, including some from the State Department and INS itself, attesting to the fact that the change at the top did not automatically free individual Aristide supporters from persecution. The IJ should not have drawn the conclusions he did from his official notice, without considering evidence in the record to the contrary.

The Board, too, relied not only on the same general conditions on which the IJ relied, but took official notice itself of additional changes in the Haitian government, notably the election of René Préval to succeed Aristide. Like the IJ, the Board relied on the general to overcome Civil's showing of specific facts on the particular, while giving her no opportunity to rebut or to demonstrate that the general country conditions did not allay her well-founded fears. Moreover, on their face, the Board's general facts are not sufficient to support its conclusion that the persecution of Aristide supporters actually diminished. The Board stated that "the rise to power by democratic forces, and the *significant efforts made* to dismantle the former military structures, have a direct impact on asylum claims from Haiti." (Emphasis added.) Similarly, the IJ relied on recent developments in Haiti as "provid[ing] a basis for *hope* that conditions in the country soon *might improve.*" (Emphasis added.) The fact that "significant efforts" are being made to dismantle the former military structures and to prevent further atrocities against Aristide's supporters does not mean that those efforts are successful. The question that the Board was required to answer was whether this particular individual had a well-founded fear of persecution, not whether, in general, there was any "hope" that conditions in Haiti "might improve" or whether "significant efforts" were being made to protect people like her.

As in *Fergiste,* the Board majority's reliance on official notice of generalized changed country conditions, instead of a particularized finding as to this individual petitioner, constitutes "legal error [which] undermines the Board's decision." 138 F.3d at 18. Viewing the record as a whole, including evidence on both sides of the question, the record does not contain substantial evidence to support the Board's implicit conclusion that the changes in general country conditions meant that Civil's fear of persecution is not well-founded. The Board's decision should be reversed, and the case remanded for the IJ to determine whether Civil is entitled to asylum as a matter of the discretion of the Attorney General. *Fergiste,* 138 F.3d at 19–20; *see* 8 U.S.C. § 1158(b)(1) (granting discretion to the Attorney General).

### B. *Due Process*

Even if the Board were permitted to take official notice of the change in country conditions, and even if the Board could extrapolate from those facts a particularized conclusion as to whether Civil herself continued to have a well-founded fear of persecution despite the change in country conditions, there is a question whether the Board violated Civil's right to due process under the Fifth Amendment by relying on extra-record facts without affording her notice or an opportunity to be heard on this new evidence.

"It is well settled that an alien in a deportation proceeding is entitled to procedural due process." *Gebremichael,* 10 F.3d at 38. This is especially important in light of the fact that "an alien's freedom to stay in this country hangs in the balance." *Id.* The question is "what process is due when the Board chooses to take official notice of conditions in the applicant's home country." *Id.* In answering this question, we recognized the conflict in the circuits, and went on to agree with the position taken here by the government that "the motion to reopen process can ordinarily satisfy the demands of due process." *Id.*

While reaching this conclusion, we nevertheless recognized that not all cases are "ordinary," and that the question of whether the motion to reopen process will satisfy the constitutional demands of due process "will, as always, ultimately depend on the circumstances." *Id.* at 39 (citing *Mathews v. Eldridge,* 424 U.S. 319, 324, 96 S.Ct. 893, 897–98, 47 L.Ed.2d 18 (1976)). We alluded to the *Administrative Law Treatise* for the proposition that "[t]he sound practice for both courts and agencies would be one of full liberality in allowing the free use of legisla-

tive facts ... along with strictness in requiring that parties be given a *predecision* chance to respond to whatever extra-record facts are relied upon." *Administrative Law Treatise* § 12:4, at 320 (Supp.1989), *quoted in Gebremichael,* 10 F.3d at 38–39. We noted one important example of why predecision input from the applicant is so critical: the applicant

is ordinarily entitled "not only to refute but, what in this situation is usually more important, to supplement, explain, and give different perspective to the facts upon which the agency relies."

*Gebremichael,* 10 F.3d at 38 n. 28 (quoting *Kaczmarczyk,* 933 F.2d at 596 n. 7 (itself quoting 4 Jacob A. Stein et al., *Administrative Law,* § 25.01 n. 7 (1986))).

In *Fergiste,* 138 F.3d at 19 n. 4, we rejected the INS position that *Gebremichael*'s language regarding motions to reopen requires rejection of petitioner's argument that due process was violated by the Board's reliance on extra-record changes in country conditions. The INS makes the same argument here, and we should reject it here too.

Thus, in *Gebremichael,* even though the motion to reopen process will "ordinarily satisfy the demands of due process," we held that the petitioner's due process rights were violated because he was not "afforded an adequate opportunity to respond" to the general facts of which the Board took administrative notice.[22] 10 F.3d at 39. We were troubled by the fact that "[t]he Board did not warn petitioner of its intention to use extra-record materials," nor "did petitioner have a predecision opportunity to respond." *Id.*

Here, too, Civil was not warned that the Board intended to consider the changes in Haiti's government in general as a ground for rejecting her claim that she had a well-founded fear of persecution. Nor was she afforded an opportunity, *before* the IJ made his decision, "not only to refute but, what in this situation is usually more important, to supplement, explain, and give different perspective to the facts upon which the agency relies." *See Gebremichael,* 10 F.3d at 38 n.

28 (quoting *Kaczmarczyk,* 933 F.2d at 596 n. 7); *Llana–Castellon,* 16 F.3d at 1099 ("In the circumstances of this case, where the BIA noticed facts and made disputable inferences based on those facts which ... were dispositive of [p]etitioners' appeal, we hold that due process requires the BIA to give [p]etitioners advance notice and an opportunity to be heard."); *Castillo–Villagra,* 972 F.2d at 1023 (same).

As the dissenting member of the Board pointed out, there are a multitude of facts, including findings by the United Nations and other objective international bodies, that have examined the human rights situation in Haiti and have concluded, even after the restoration of Aristide and later Préval to the presidency, that former members of the Ton Ton Macoutes and supporters of the former dictatorship have continued to terrorize, torture, and kill Haitians who support Aristide. *See supra.* The restoration to the presidency has not been enough to control the anti-Aristide forces.

In reaching its own conclusion based on the second layer of administratively noticed facts—again, without giving Civil an opportunity to respond to the disputable facts or the inferences the Board drew therefrom—the Board (on appeal from the IJ's decision) "abused our presumption of good faith and ran afoul of petitioner's procedural rights." *Gebremichael,* 10 F.3d at 39.

The Board acknowledged the significant extent of its reliance on such officially noticed and unrebutted general facts: "The political changes in Haiti, which include the gain of power by those whom the applicant supports, are a *significant factor in our conclusion* that the applicant has not established a well-founded fear of persecution." If given the opportunity to rebut these noticed facts, Civil would have been able to introduce into evidence reports from the United Nations High Commissioner for Refugees and others (including a U.N. report issued on August 14, 1997), attesting that human rights abuses continued to occur with regularity in Haiti, long after Préval's election.

---

**22.** Those facts included changes in the government of Ethiopia and the general improvement of human rights conditions there, including that

"there were no widespread acts of persecution of minorities" after the change of government, a fact that surely is not present in Haiti.

Thus, while the general facts are undisputed (restoration of Aristide, election of Préval), the inferences regarding their impact on Civil's fear of persecution are disputed. In addition to violating her right to procedural due process, this goes to the legitimacy of the basis for the Board's conclusion, which is unsupported by the record taken as a whole.

Finally, as we noted in *Gebremichael,* "the filing of a motion to reopen does not automatically stay deportation," *id.* at 39 n. 29. This factor also comes into play in the instant case. After the BIA's order dismissing her appeal on June 26, 1997, Civil was required to file an appeal within thirty days under IIRIRA Sec. 309(c)(4) (Transitional Rule) in order to seek a stay of deportation. This is still another factor that renders the motion to reopen process insufficient to satisfy Civil's due process rights.[23]

### Conclusion

In my view, the BIA evaluation of the facts in this case contains improper legal analysis and is not supported by substantial evidence in the record; it rests on unsubstantiated speculation by the Immigration Judge. Moreover, the IJ and BIA made errors of law by taking official notice of changes in generalized country conditions without considering whether those changes would affect whether this particular individual had a well-founded fear of persecution, and without affording her notice or an opportunity to rebut the facts officially noticed. Accordingly, I believe the BIA decision should be reversed. I respectfully dissent.

---

**23.** The majority attempts to take some of the sting out of its ruling by referring to a new Executive Order directing the Attorney General to defer for one year the deportation of any Haitian national who arrived in the United States prior to December 31, 1995 and who has been continuously present since that date. *See Ante* at 56 n. 5. "[W]hen an alien's freedom to stay in this country hangs in the balance," *Gebremichael,* 10 F.3d at 38, and where, as here, she has established a well-founded fear that serious bands of her countrymen would persecute her because of her political beliefs, I would not rely on so slender a reed as the hope that something might change in Civil's favor during the coming year. *See Cardoza–Fonseca,* 480 U.S. at 426 n. 3, 107 S.Ct. at 1210 n. 3 (holding that the possibility that alien might become permanent resident by invoking new procedures if she was unsuccessful in her pending request for asylum did not render her request moot, where procedures for administering new act were not in place and alien might have been able to obtain permanent residence status through asylum procedure sooner than through the legalization program). Here, Civil does not even have the hope of a specific legalization program, but only a deferral of her deportation.